**FAIRBANKS, MORSE & CO. v. CITY OF WAGONER, OKL., et al.**

**CITY OF WAGONER, OKL., v. FAIRBANKS, MORSE & CO.**
Nos. 1243, 1244.

Circuit Court of Appeals, Tenth Circuit.
Jan. 9, 1936.

Henry G. Snyder, of Oklahoma City, Okl., and Vincent L. Boisaubin, of St. Louis, Mo. (Snyder, Owen & Lybrand, of Oklahoma City, Okl., Jones, Hocker, Gladney & Jones, of St. Louis, Mo., and Poppenhusen, Johnston, Thompson & Cole, of Chicago, Ill., on the brief), for Fairbanks, Morse & Co.

D. H. Linebaugh, of Muskogee, Okl. (John H. Scriba, of Wagoner, Okl., on the brief), for City of Wagoner et al.

Before LEWIS, PHILLIPS, and McDERMOTT, Circuit Judges.

PHILLIPS, Circuit Judge.

On August 19, 1930, Fairbanks, Morse & Company, hereinafter called Fairbanks Morse, commenced a suit in equity against the City of Wagoner, hereinafter called the City, and its municipal officers, predicated on a contract dated September 27, 1927, entered into between Fairbanks Morse and the City.

The contract read in part as follows:

"General Engine Proposal
"Date Sept. 22, 1927.

"Fairbanks, Morse * * *, propose to furnish and deliver to The City * * *.

"* * *, the following machinery and materials: 1-360 HP Special Electric Type Y Style VA Diesel Engine direct

connected to 300 KVA 3 phase, 60 cycle, 2400 volt Alternator and 10 KW Shunt Wound Exciter; and 1-180 HP Special Electric Type Y Style VA Diesel Engine direct connected to 150 KVA 3 phase, 60 cycle 2400 volt Alternator and 7½ KW Shunt Wound exciter; together with foundations for the machinery, exhaust tunnels, stacks, circulating pumps, switchboards, cooling tower, water softener and other equipment necessary for a complete installed power plant but except building * * *.

"* * * *, the * * * City * * * * hereby contracts that it will pay to Fairbanks, Morse * * *, as purchase price of said Diesel engines and necessary equipment, apparatus and machinery, and for installation of same, the sum of Fifty Five Thousand One Hundred Ninety Five Dollars and Four Cents ($55,195.04), in equal monthly installments covering a period of fifty-two (52) consecutive months, * * * it is hereby expressly contracted * * * that the payment of said sum * * *, shall be made only from the amount of money which the City * * * will save in the cost of the production of electricity, the saving for any month or part thereof to be the cost of production per kilowatt hour, after the plant has been improved and extended, in pursuance of this contract, as compared with the average cost of production per kilowatt hour to the City * * * for the fiscal year 1926–1927, that is, said saving for any month, or part thereof, to be the difference between the average cost of said production per kilowatt hour for the fiscal year 1926–1927, which has been estimated and determined and is hereby agreed by the parties hereto to be the sum of three and three-hundredths (3.03) cents per kilowatt hour, and the average cost of production of electricity per kilowatt hour for said month or period thereof, after said plant has been improved and extended in pursuance of this contract, and in estimating said cost of production of electricity for such month or period thereof, there shall be included the cost of all repairs to said plant, and salaries and wages of engineers, employes, mechanics, and laborers and other workers engaged in the operation and maintenance of said plant, and all expenses for fuel and oil, and all other expenses and expenditures reasonably necessary for the production of electricity and the operation, maintenance and upkeep of said plant and the machinery, equipment, appliances and

appurtenances thereunto belonging and appertaining, and the buildings and structures housing and protecting same, and the cost of insurance on said plant, machinery, equipment, appliances and appurtenances, and said buildings and structures, and in making said estimate there shall not be included any cost of distribution of said electricity to the consumers thereof, nor the expense of collecting for charges made for electricity supplied by said City to consumers and customers; provided, further, that in estimating the production cost of electricity the operating expense must be based on an efficient and economical operation of plant in every particular; and which money so saved or so much thereof as shall be necessary, shall be applied monthly by the City * * * to the payment of said monthly installments, together with any interest that may become due thereon, and said monthly installments shall be paid only from said savings above described and from no other fund, money, property or assets of the City * * *, and no taxes, general or special, shall ever be levied upon the property of the City * * * to pay all or any part of the said sum * * * or any interest due thereon; and it is expressly hereby agreed and understood that this contract does not now nor shall it ever be held to create a debt of the City * * * for the payment of which taxes, general or special, might or could be levied upon the property of the inhabitants of the City * * *."

It provided that the monthly installments should be evidenced by fifty-two instruments or notes in the following form:

"Wagoner, Oklahoma.

"......, 19..

"...... months after date, for value received, the City * * * promises to pay Fairbanks, Morse * * *, or order at St. Louis, Missouri, ...... with interest from maturity until paid at the rate of six per cent (6%) per annum.

"This instrument is one of a series of fifty-two (52) instruments or notes of even date. This is not a general obligation of the City * * *, but a special obligation, payable only from the savings in cost of production of electricity by improved electric light and power plant sold to said City * * * by said Fairbanks, Morse * * *, over cost of production of electricity by present light and power plant of said City * * * for the fiscal year

1926–1927, as provided in a certain written contract between said City and said Company, to which reference is hereby made and which is hereby made a part hereof.

"Default shall not be made in the payment of this note, nor in any of said series of fifty-two (52) instruments or notes, above mentioned, so long as said savings are applied to the payment thereof, as provided in said written contract, hereby referred to and made a part hereof, and all said savings shall immediately be applied to and paid on this note and said series of notes on their respective dates of maturity, and if insufficient to fully discharge and pay same, said savings shall be continued to be applied immediately to and paid thereon for a period of not to exceed 120 months from the date of this note and said other notes in said series of fifty-two (52) instruments, to-wit: ......, 1927, and any sum or sums unpaid upon said installments when due shall draw interest at six per cent (6%) per annum from date same

should have been paid until paid in full, and at the expiration of said 120 months, if said savings have been applied and paid as aforesaid, any amount or amounts remaining due and unpaid on this note or instrument, or any of said series of fifty-two (52) instruments or notes, shall be cancelled, and this instrument or note, and any and all of said series of fifty-two (52) instruments or notes, with any and all interest, shall be deemed and held paid and satisfied in full, * * *.

> "City of Wagoner, Oklahoma,
> "By ..........
> "Mayor of said City."

The primary question presented is whether the City undertook to create an indebtedness in violation of the provisions of the Oklahoma Constitution and the City Charter set out in subjoined note 1.[1]

The facts established by the evidence and found by the trial court are these:

In 1912, the City acquired a privately owned electric light plant and distributing

---

[1] Sections 26 and 27, art. 10 of the Oklahoma Constitution read as follows:

"Sec. 26. No county, city, town, township, school district, or other political corporation, or subdivision of the State, shall be allowed to become indebted, in any manner, or for any purpose, to an amount exceeding, in any year, the income and revenue provided for such year, without the assent of three-fifths of the voters thereof, voting at an election, to be held for that purpose, nor in cases requiring such assent, shall any indebtedness be allowed to be incurred to an amount including existing indebtedness, in the aggregate exceeding five per centum of the valuation of the taxable property therein, to be ascertained from the last assessment for State and county purposes previous to the incurring of such indebtedness: Provided, That any county, city, town, township, school district, or other political corporation, or subdivision of the State, incurring any indebtedness, requiring the assent of the voters as aforesaid, shall, before or at the time of doing so, provide for the collection of an annual tax sufficient to pay the interest on such indebtedness as it falls due, and also to constitute a sinking fund for the payment of the principal thereof within twenty-five years from the time of contracting the same."

"Sec. 27. Any incorporated city or town in this State may, by a majority of the qualified property tax paying voters of such city or town, voting at an election to be held for that purpose, be allowed to become indebted in a larger amount than

that specified in section twenty-six, for the purpose of purchasing or constructing public utilities, or for repairing the same, to be owned exclusively by such city: * * *."

Section 31, article 6 of the City's charter, reads as follows:

"Neither the board of commissioners nor any officer or employee of the city shall have authority to make any contract involving the expenditure of public money, or impose upon the city any liability to pay money unless and until a definite amount of money shall have been appropriated for the liquidation of all pecuniary liability of the city under such contract or in consequence thereof to mature during the period covered by the appropriation. Such contract shall be null and void as to the city for any other and further liability * * *."

Section 15, article 14, of such charter, reads as follows:

"No contract shall be entered into by the board of commissioners until after the appropriation has been made therefor, nor in excess of the amount appropriated, and all contracts shall be made upon specifications. No contract shall be binding upon the city unless it has been signed by the mayor and countersigned by the city clerk, and the expenses thereof charged to the proper fund liable for the payment of the same, and whenever the contracts charged to any fund equal the appropriation made therefor, no further contract shall be signed by the mayor or city clerk, the payment of which comes from such fund."

system. From the date of its acquisition to September 27, 1927, the electric utility was operated by the City without resort to taxation and the income therefrom was sufficient to maintain the plant, pay all operating expenses and yield a profit to the City.

On August 31, 1927, pursuant to an ordinance theretofore duly adopted, a special election was held by the City for the submission, to the qualified electors of the City, of the proposition that the City enter into a contract for the furnishing and installing of "Diesel engines and necessary equipment, apparatus, machinery and appurtenances * * *, for extension and improvement of the electric light and power plant of the City." At such election 376 votes were cast in favor of, and 286 votes against such proposition. Thereafter, the City adopted specifications and advertised for bids for furnishing and installing the new power plant. On September 19, 1927, the bid of Fairbanks Morse was accepted subject to the submission of a satisfactory contract. The contract above referred to was submitted, and the City adopted an ordinance approving it and authorizing the mayor and city clerk to execute it in behalf of the City. It was duly executed on October 6, 1927. In making the bid and entering into the contract, Fairbanks Morse acted in good faith.

Fairbanks Morse Company delivered and installed the new power plant, and the City Commissioners, by a unanimous vote, accepted same and directed the mayor and city clerk to execute and deliver the notes to Fairbanks Morse. They were so executed and delivered.

The new power plant was duly and properly furnished and installed, and fully conformed to the contract specifications.

On March 16, 1928, the City commenced the use of the new power plant to generate electric energy for its electric utility. Until May 7, 1928, the electric utility was in charge of an experienced and competent engineer who operated the new power plant properly, efficiently and economically. The electric utility was under the supervision of the City Water & Light Commissioner. On May 7, 1928, a new Water & Light Commissioner took office. He immediately discharged the engineer in charge of the electric utility, and placed it in charge of an inexperienced and incompetent engineer. The new commissioner was opposed to the purchase of the new power plant and favored the buying of

electric energy from the Public Service Company of Oklahoma; and he placed the incompetent engineer in charge of the electric utility with the deliberate purpose of creating the impression upon the inhabitants of the City that the Diesel engines were inefficient, expensive to operate, and not capable of carrying the rated capacity load specified in the contract. The new engineer operated the new power plant until October 17, 1930, when the engines were disconnected and their use discontinued. After the new engineer took charge, the Diesel engines were negligently, unskillfully and improperly cared for and operated. A water softener was not used, scale collected in the cooling system, the engines were overheated, nine cylinder heads were cracked, water was permitted to escape into the cylinders and dilute the lubricating oil, and the pistons and cylinders were scored.

On September 17, 1927, Zachary and Eby, residents and taxpayers of Wagoner, commenced a suit in the District Court of Wagoner County, Oklahoma, against the City, its mayor and commissioners to enjoin the execution of the contract on the ground it undertook to create an indebtedness contrary to the provisions of the Oklahoma Constitution and the City Charter set out in note 1. After the contract was executed by the City, Zachary and Eby filed a supplemental bill in which they sought to enjoin the City from carrying it out. The trial court sustained a demurrer to the supplemental petition, and entered a decree of dismissal. On appeal the Supreme Court reversed the decree and remanded the cause with instructions to overrule the demurrer. Zachary v. City of Wagoner, 146 Okl. 268, 292 P. 345.

Fairbanks Morse was not a party to the suit in the state court. It did not directly or indirectly participate in the trial in the District Court or the hearing in the Supreme Court, or in anywise direct or control the litigation of the suit. It furnished the mayor $750 with which to employ counsel to represent the City on the appeal. The counsel employed in nowise represented Fairbanks Morse.

The mandate from the Supreme Court in Zachary & Eby v. City of Wagoner, was received by the District Court of Wagoner County and spread of record October 10, 1930. On October 11, 1930, a decree was entered by the State Court permanently enjoining the City from carrying out the contract.

On October 16, 1930, the city commissioners adopted an ordinance authorizing the mayor and city clerk, in behalf of the City, to enter into a contract with the Public Service Company for the purchase by the City from the Public Service Company of electric energy for a period of six months.

The rates provided for in such contract with the Public Service Company were 3 cents per K.W.H. for lighting, small power and appliances, 2.05 cents per K.W.H. for industrial power, and 2 cents per K.W.H. for street lighting, municipal building lighting and municipal water pumping. The City also bore the line loss. The minimum rate under the contract was .40 cents, and the maximum rate 1.40 cents in excess of the average cost to the City of producing electricity during the period the new power plant was used by the City, even with the unskillful, careless and inefficient operation by the City.

On June 25, 1931, Fairbanks Morse filed its application for the appointment of a receiver to take charge of, and operate the electric utility with the new power plant, and offered to place the engines in operating condition.

On the same day the Court entered an order appointing T. C. Harrill, receiver, to take charge of and operate the electric utility. Fairbanks Morse expended $1750.-71 in reconditioning the engines and placed them in fair operating condition. The receiver was ordered to keep accurate accounts of operating costs and expenses and of earnings, and to retain the net earnings until the further order of the court. E. D. Lord succeeded Harrill as receiver on October 3, 1932. The electric utility has been continuously operated by such receivers since July 13, 1931.

The City, prior to September 27, 1927, had fixed the rates for domestic use at 12 cents per K.W.H. The Court entered an order reducing such rate to 8 cents per K.W.H. effective November 1, 1931.

The City operated the electric utility with the new power plant from March 16, 1928, to August 17, 1930, a period of two years, five months and one day. The receivers' reports considered in the Court's findings covered the receivers' operation from July 13, 1931, to August 28, 1933, a period of two years, one month and fifteen days.

For the twelve months ending June 30, 1927, the cost of producing electric energy with the steam plant was 3.03 cents per K.W.H.

For the month of April 1928, when the new power plant was operated by a competent engineer, the cost was .98 cents per K.W.H. For the month of May 1928, six days of which the new power plant was operated by a competent engineer, the cost was 1.81 cents per K.W.H.

During the period of the City's operation 1,877,500 K.W.H.'s of electric energy were produced at an average cost of 1.60 cents per K.W.H. This was 1.43 cents per K.W.H. less than the average cost for the fiscal year 1926–1927, and the new power plant effected a saving of $27,189.30. During the period covered by the receivers' reports 1,688,700 K.W.H.'s of electric energy were produced at an average cost of 1.003 cents per K.W.H. This was 2.027 cents per K.W.H. less than the average cost for the fiscal year 1926–1927, and the new power plant effected a saving of $34,255.88.

Due to the fact that the equipment was in better condition when the period of the City's operation commenced than during the period of the receivers' operation, the former period should have reflected a greater saving than the latter. The costs during the period of the City's operation were excessive due to the careless, improper and inefficient operation of the plant by the new engineer. If the City had operated the plant at no greater costs than the receiver, the savings effected would have been increased $11,208.68, and the total saving for both periods would have been $72,623.86.

The actual savings for the combined period of the City's and the receivers' operations average slightly in excess of $1,274.00 per month. The notes evidencing the monthly installments under the contract were each for $1,061.44.

The City owns and operates a water utility which furnishes water to the City and its inhabitants. Since September 27, 1927, the pumping plant at the waterworks has been operated by electric energy furnished from the electric utility. In its accounting system the City charged its water utility and credits its electric utility with the electric energy used at the pumping plant, but no funds received by the water utility have been used to pay the cost of producing the electric energy used at the water plant.

The cost of energy furnished the water utility during the period of the City's op-

eration of the Diesel plant was $3,650.21, and during the receivers' operation was $11,420.93. The increase during the latter period is due to the fact that the meter during the period of the City's operation was defective and under registered.[2]

No charge has been made either by the City or the receiver for electric energy used by the City at the city parks, city buildings, and the cemetery, and for street lighting and other City purposes. During the period covered by the receivers' reports, 22,590 K.W.H.'s were used in the city parks, City Hall, City Library and cemetery, and 124,597 K.W.H.'s were used in the white way and residence street lighting systems.

During the period of the City's operation, electrical energy was being supplied to churches, public schools, and certain individuals without charge; and meters were permitted to be tampered with resulting in some cases in no registration and in others of under registration of the amount of current used. The receiver corrected these conditions. The loss due thereto during the period of the City's operation amounted to $3,755.00.

During the period of the City's operation, the total revenue of the electric utility was $56,203.67, and the total expense for labor, materials, supplies, replacements and maintenance of the entire plant was $45,375.07. During the receivers' operation, the total revenue actually received was $47,047.09, and the total expense for labor, material, supplies, replacements and maintenance of the entire plant was $27,964.82, leaving net earnings of $19,082.27. The net earnings would have been $26,030.62 had the rates not been reduced.

The Court made a recapitulation which we set forth in subjoined note 3.[3]

If the City had operated the electric

---

[2] The meter registered 6440 K.W.H.'s in May 1930. It was repaired in June 1930. In July 1930, it registered 21,000 K.W.H.'s indicating there had been a very substantial under registration while the meter was out of repair.

[3] City's Operation.

| | |
|---|---|
| Operating income | $56,203.67 |
| Operating and maintenance expense | 45,375.07 |
| Net income | $10,828.60 |
| Add, adjustment for loss of income | 3,755.00 |
| Add, adjustment production cost | 11,208.68 |
| Total adjusted net income | $25,792.28 |
| To this, if water utility be required to defray cost of production of pump current, add | 3,650.21 |
| Which would make total adjusted net profit during City's operation of | $29,442.49 |

Receivers' Operation.

| | |
|---|---|
| Operating income | $47,047.09 |
| Operating and maintenance expense | 27,964.82 |
| (Not including receivership expenses) Net income | 19,082.27 |
| If monies impounded to pay cost to produce pump current to be so applied, add | 11,420.93 |
| Total net operating profit during receivers' operations, including cost to produce pump current | $30,503.20 |

In connection with receivers' operation, the total extraordinary expense for receivers' and their attorneys' fees for receivers' operating period calculated was $5,714.70.

Actual Net Profit Combined Period City's and Receivers' Operations, not Including Receivership Expenses.

| | |
|---|---|
| City's operation | $10,828.60 |
| Receivers' operation | 19,082.27 |
| Total | $29,910.87 |
| Add adjustment for loss of income | a. |
| City's operation | 3,755.00 |
| Add, adjustment excessive production cost City's Operation | 11,208.68 |
| Total adjusted net profit excluding receivership expense and without adding production cost pump current | $44,874.55 |
| If production cost pump current added: City's operation | 3,650.21 |
| If production cost pump current added: Receivers' operation | 11,420.93 |
| Total, including production cost pump current and excluding receivership expenses | $59,945.69 |

a. But for the defective meter this item would no doubt have been in excess of $12,000.00.

utility with proper skill, care and attention, the savings effected and net earnings produced by the new power plant would have been sufficient to have paid the installment notes monthly as they matured without resort directly or indirectly to tax revenues.

During the period of the City's operation it paid in liquidation of 19 of the notes $20,167.36 principal, and $166.67 interest. Thirty-three of the notes remain unpaid.

The bill prayed that the defendants account for any funds in the hands of the City Treasurer which represents savings in the cost of producing electricity with the new power plant, that the defendants be required to apply same on the balance due on the contract, and that the defendants be required to pay the remainder out of future savings effected by the new power plant.

The answer set up the proceedings and judgment in the state court suit, and the alleged invalidity of the contract. It alleged that the City paid to Fairbanks Morse $20,332.03 on the contract; that it paid $7,700 thereof, out of a sinking fund and was entitled to recover back double the amount of such payment. It prayed that the contract and the unpaid notes be cancelled and that plaintiff recover the sum of $28,032.03 with interest.

The trial court held the contract was void because it made no provision for a depreciation reserve and, therefore, cast an incidental tax burden on the taxpayers of the city.

It concluded that Fairbanks Morse was entitled to retain the sum of $20,167.36, principal and $166.67, interest paid on the contract, and to remove and take into its possession, the engines and equipment; and that the City was entitled to the net proceeds in the hands of the receiver derived from the operation of the light plant after deducting the costs and expenses of the receivership. It entered a decree accordingly and both sides have appealed.

█ The object of the provisions of the Oklahoma Constitution and City Charter set out in note 1, is to place restrictions on the taxing power and on the incurring of indebtedness payable out of tax revenues. Campbell v. State, 23 Okl. 109, 99 P. 778, 784, 785; Faught v. Sapulpa, 145 Okl. 164, 292 P. 15, 22.

Section 26 of article 10 of the Oklahoma Constitution was adopted from the Missouri Constitution of 1875.

There has grown up in many jurisdictions in this country what is commonly known as the special fund doctrine to the effect that a contract by a municipality to purchase and pay for property solely out of the net earnings of the property, without resort directly or indirectly to revenues derived from taxation, does not create a debt within the meaning of such constitutional provisions.

The doctrine has been approved in Missouri, and Oklahoma and many other states.[4]

4 Missouri: State v. City of Neosho, 203 Mo. 40, 101 S.W. 99, decided March 30, 1907; Bell v. City of Fayette, 325 Mo. 75, 28 S.W.(2d) 356; State v. Smith, 335 Mo. 825, 74 S.W.(2d) 367.

Oklahoma: Baker v. Carter, 165 Okl. 116, 25 P.(2d) 747.

Alabama: In re Opinion of the Justices, 226 Ala. 18, 145 So. 481; In re Opinion of the Justices, 226 Ala. 570, 148 So. 111; In re Opinion of the Justices, 228 Ala. 140, 152 So. 901; Oppenheim v. City of Florence, 229 Ala. 50, 155 So. 859.

Arkansas: Mississippi Valley Power Co. v. Board of Improvement, Water Works District No. 1 of Van Buren, 185 Ark. 76, 46 S.W.(2d) 32; McCutchen v. City of Siloam Springs, 185 Ark. 846, 49 S.W.(2d) 1037; Jernigan v. Harris, 187 Ark. 705, 62 S.W.(2d) 5.

California: Shelton v. City of Los Angeles, 206 Cal. 544, 275 P. 421; Department of Water and Power of City of Los Angeles v. Vroman, 218 Cal. 206, 22 P. (2d) 698; California Toll Bridge Authority v. Kelly, 218 Cal. 7, 21 P.(2d) 425.

Colorado: Shields v. City of Loveland, 74 Colo. 27, 218 P. 913; Searle v. Town of Haxtun, 84 Colo. 494, 271 P. 629; Franklin Trust Co. v. City of Loveland (C.C.A.8) 3 F.(2d) 114.

Florida: State v. City of Miami, 113 Fla. 280, 152 So. 6.

Illinois: Ward v. City of Chicago, 342 Ill. 167, 173 N.E. 810; City of Jerseyville v. Connett (C.C.A.7) 49 F.(2d) 246.

Indiana: Underwood v. Fairbanks, Morse & Co., 205 Ind. 316, 185 N.E. 118.

Iowa: Wyatt v. Town of Manning, 217 Iowa, 929, 250 N.W. 141; Greaves v. City of Villisca, 217 Iowa, 590, 251 N.W. 766.

Kentucky: City of Bowling Green v. Kirby, 220 Ky. 839, 295 S.W. 1004; Kentucky Utilities Co. v. City of Paris,

It is true that the special fund doctrine was disapproved in Zachary v. City of Wagoner, 146 Okl. 268, 292 P. 345, 348.[5]

However in the later case of Baker v. Carter, 165 Okl. 116, 25 P.(2d) 747, 755, the court expressly approved the special fund doctrine. In the opinion the court in part said:

"59 C.J. page 225, § 370, announced this general rule: 'Obligations, issued by a state, if payable only from the revenue to be realized from a particular utility or property acquired with the proceeds of the obligations, if payable only from the revenue to be realized from special taxes for a particular utility or property, acquired by the obligations or proceeds, or if payable only from a special fund to be raised from the sale or lease of lands previously set apart for the purpose of the obligations, do not generally constitute debts of the state within the meaning of constitutional limitations on indebtedness.' * * *

"The Supreme Court of California, Garrett v. Swanton, 216 Cal. 220, 13 P.(2d) 725, 729 in construing the special fund doctrine, held as follows:

" 'The overwhelming weight of judicial opinion in this country is to the effect that bonds, or other forms of obligation issued by states, cities, counties, political subdivisions, or public agencies by legislative sanction and authority, if such par-

---

248 Ky. 252, 58 S.W.(2d) 361; Reconstruction Finance Corporation v. City of Richmond, 249 Ky. 787, 61 S.W.(2d) 631.

Minnesota: Williams v. Village of Kenyon, 187 Minn. 161, 244 N.W. 558.

Michigan: Young v. City of Ann Arbor, 267 Mich. 241, 255 N.W. 579.

Montana: Barbour v. State Board of Education, 92 Mont. 321, 13 P.(2d) 225; State v. State Board of Education, 97 Mont. 121, 33 P.(2d) 516.

Nebraska: Carr v. Fenstermacher, 119 Neb. 172, 228 N.W. 114; Kirby v. Omaha Bridge Comm., 127 Neb. 382, 255 N.W. 776.

New Mexico: Seward v. Bowers, 37 N.M. 385, 24 P.(2d) 253.

New York: Kelly v. Merry, 262 N.Y. 151, 186 N.E. 425.

North Carolina: Brockenbrough v. Board of Water Commissioners, 134 N.C. 1, 46 S.E. 28.

North Dakota: Lang v. City of Cavalier, 59 N.D. 75, 228 N.W. 819; Thomas v. McHugh (N.D.) 256 N.W. 763.

Ohio: Kasch v. Miller, 104 Ohio St. 281, 135 N.E. 813; Pathe v. Donaldson, 29 Ohio App. 171, 163 N.E. 204.

Oregon: Butler v. City of Ashland, 113 Or. 174, 232 P. 655; McClain v. Regents of University, 124 Or. 629, 265 P. 412.

Pennsylvania: Tranter v. Allegheny County Authority, 316 Pa. 65, 173 A. 289.

South Carolina: Cathcart v. City of Columbia, 170 S.C. 362, 170 S.E. 435.

Texas: Sowell v. Griffith (Tex.Com. App.) 294 S.W. 521; City of Houston v. Allred, 123 Tex. 334, 71 S.W.(2d) 251.

Utah: Barnes v. Lehi City, 74 Utah, 321, 327, 279 P. 878.

Washington: Twichell v. City of Seattle, 106 Wash. 32, 179 P. 127; State v. Clausen, 134 Wash. 196, 235 P. 364.

West Virginia: Brewer v. City of Point Pleasant, 114 W.Va. 572, 172 S.E. 717;

Casto v. Town of Ripley, 114 W.Va. 668, 173 S.E. 886.

Wyoming: Arnold v. Bond, 47 Wyo. 236, 34 P.(2d) 28.

5 In the Zachary Case the court said: "We are not unmindful of the rule followed in some jurisdictions that the purchase of property does not create an indebtedness if the purchase price is to be paid out of the income therefrom (Winston v. City of Spokane, 12 Wash. 524, 41 P. 888; Faulkner v. City of Seattle, 19 Wash. 320, 53 P. 365; Joliet v. Alexander, 194 Ill. 457, 62 N.E. 861; East Moline v. Pope, 224 Ill. 386, 79 N.E. 587, and other cases), but we cannot follow such holding. In our opinion, this is but another attempt to nullify and evade the wholesome constitutional limitations upon the power of municipalities to create indebtedness and to usurp powers never intended to be granted to municipal officers. The reasoning in support thereof is the ingenious argument by which such attempts have ever been supported. Under the decisions of this court and the Constitution and laws of Oklahoma, the agreement to pay for the material purchased creates an indebtedness no matter from what source the funds are to be derived from which the payment is to be made. Sections 26 and 27, article 10, supra, contain nothing that limits their application to indebtedness to be paid from funds derived from ad valorem tax levy. They are general in their terms and they will be applied by this court to all manner of indebtedness, no matter how created or from what source the indebtedness is to be paid. As well might a municipality contend that an indebtedness was not an indebtedness because it was to be paid from receipts from gross production tax or other sources of income other than ad valorem taxation. We cannot give our approval to any such theory of the law."

ticular bonds or obligations are secured by and payable only from the revenues to be realized from a particular utility or property, acquired with the proceeds of the bonds or obligations, do not constitute debts of the particular state, political subdivision, or public agency issuing them, within the definition of "debts" as used in the constitutional provisions of the states having limitations as to the incurring of indebtedness. * * *

" 'Thus it is well established that an indebtedness or liability is incurred when by the terms of the transaction a municipality is obligated directly or indirectly to feed the special fund from general or other revenues in addition to those arising solely from the specific improvement contemplated. It also seems to be well settled, as a second limitation to the doctrine, that a municipality incurs an indebtedness or liability when by the terms of the transaction the municipality may suffer a loss if the special fund is insufficient to pay the obligation incurred. * * *'

"An examination of many authorities cited in the brief and a research of many others conducts us to the conclusion that, so far as the special fund doctrine is concerned, the majority rule as set forth in the case of Garrett v. Swanton et al., supra, announces the correct rule that a limitation upon state or municipal indebtedness is not violated by an obligation which is payable out of a special fund, if the state or municipality is not liable to pay the same out of its general fund should the special fund prove to be insufficient and the transaction by which the indebtedness is incurred cannot in any event deplete the resources of the state or the municipality, limited to the two exceptions noted therein."

Furthermore only the petition and demurrer were before the Supreme Court in Zachary v. City of Wagoner, supra, and it is apparent from a statement in Baker v. Carter, supra, that the court conceived the facts to be that the payments were to be made from the earnings of the entire plant, part of which had been acquired with funds derived from ad valorem taxation, whereas in fact the payments were to be made solely from the earnings of the new power plant.[6]

Where a contract is fairly susceptible of two constructions, one of which will render it lawful and the other unlawful, the former will be adopted. Hobbs v. McLean, 117 U.S. 567, 576, 6 S.Ct. 870, 29 L.Ed. 940; Great Northern Ry. Co. v. Delmar Co., 283 U.S. 686, 691, 51 S.Ct. 579, 75 L.Ed. 1349; E. I. Du Pont De Nemours & Co. v. Claiborne-Reno Co. (C.C. A.8) 64 F.(2d) 224, 228, 89 A.L.R. 238; Moffat Tunnel Improvement Dist. v. Denver & S. L. Ry. Co. (C.C.A.10) 45 F.(2d) 715, 733. Therefore, if the language of the contract permits, we should adopt a construction that will render it valid and enforceable.

The property sold was a complete power or generating plant. The payments were to be made from the savings effected by the new power plant over the old steam power plant. The savings were in fact, a portion of the net earnings of the generating plant because in arriving at such savings, there were to be deducted salaries and wages of engineers, employees, mechanics, laborers and other workers engaged in the operation and maintenances of the plant, all expenses for fuel and oil and all other expenses reasonably necessary for the production of the electricity and the maintenance, upkeep and repair of the plant, machinery, equipment, appliances and appurtenances and the buildings and structures housing the same, and the cost of insurance on the plant machinery, equipment, appliances, appurtenances, buildings and structures. The only costs or expenses that were not to be deducted were distributing costs and the expense of collect-

---

[6] In Baker v. Carter, the court said: "The case of Zachary et al. v. City of Wagoner, 146 Okl. 268, 292 P. 345, is cited by the plaintiffs as authority for their contention that in this case a debt is created in violation of the said constitutional provisions. In that case the city of Wagoner purchased Diesel engines, and provided for the payment of the purchase price thereof over a period of years from the savings accruing to the city each month from the operation of the said plant during said period of time when operated with the Diesel engines over the income derived from the plant accruing during a like period of the fiscal year of 1926–27 before it was equipped with the Diesel engines, and this court held that an indebtedness was created thereby in violation of the constitutional provisions. In that case a portion of the corpus of the lighting system of the city created by an ad valorm tax was utilized to feed the special fund provided for the payment of the Diesel engines."

ing charges. These were not generating costs, but were properly allocated to the distributing system.

It will be noted that the electric utility, with the steam power plant, produced income sufficient to maintain the same, pay all operating expenses, and yield a profit to the City. The new power plant reduced the costs of generation approximately two cents per K.W.H. or an average monthly saving of about $1300 per month. If the light utility, with the expensive steam plant produced sufficient revenue to pay all costs of maintenance and all operating costs and, in addition, to yield a profit to the City, with a saving of $1300 per month effected by the new power plant in generating costs, it should still yield sufficient net earnings to pay costs of maintenance, operating expenses and to permit the use of $1061.44 of the earnings of the new equipment to be used to pay the purchase price thereof, without resort to taxation to maintain or operate the plant.

■ The trial court was of the opinion the contract was invalid because it made no provision for a reserve for depreciation of the plant. It will be noted that the contract provides for the deduction of all costs and expenses "for the production of electricity and the operation, maintenance and up-keep of said plant and the machinery, equipment, appliances and appurtenances * * *, and the buildings and structures housing and protecting same."

It is well settled by works on accounting and by accepted accounting practices, that depreciation is an operating cost or expense. American Business Accounting, Jones, Ludlow, Hayden & Winchell, Vol. 1, pp. 39, 383, 385; Science of Accounts, Bentley, pp. 60, 145.

Mr. Bentley in his Science of Accounts, says:

"In a manufacturing concern the depreciation of the assets used in connection with the production department, reduced to dollars and cents, represents the cost of services rendered by those assets (factory buildings, machinery, tools, stable equipment, etc.) and must be included among the manufacturing expenses."

That the parties intended something more than the cost of repairs should be deducted, is indicated by the fact that the contract, after providing for deducting costs of repairs, later makes further provision for the deduction of expenses for operation, maintenance and up-keep.

We conclude the contract provided for the deduction of depreciation.

■ Where a contract is for the purchase of one unit of a utility, the other unit or units of which have been provided for by tax revenues, an agreement to pay for the unit purchased out of the earnings of the entire utility casts an incidental burden on the taxpayers, and falls within the inhibition of constitutional provision like section 26 of article 10, supra. City of Campbell v. Arkansas-Missouri Power Co. (C.C.A.8) 55 F.(2d) 560, 563. But if the purchase price is payable only from the net earnings of the unit purchased, and there is a reasonable allocation of earnings to that unit, the contract is valid. City of Campbell v. Arkansas-Missouri Power Co. (C.C.A.8) 65 F.(2d) 425; Bell v. City of Fayette, 325 Mo. 75, 28 S.W. (2d) 356, 360; State v. Smith, 335 Mo. 825, 74 S.W.(2d) 367, 371; Schnell v. City of Rock Island, 232 Ill. 89, 83 N.E. 462, 14 L.R.A.(N.S.) 874.[7]

[7] In Bell v. City of Fayette, supra, the court said:

"It will be noted that the distinction is whether any other property of the city is liable for the payments or whether the purchase price of such improvement is to be paid for wholly out of the earnings of the improvement.

"Appellant admits the general principle stated in McQuillin, but seeks to make a distinction between the Neosho Case [203 Mo. 40, 101 S.W. 99] and this case, in this; that in the Neosho Case the city purchased the waterworks and agreed to pay for it out of its own earnings as the city realized such earnings from the private consumers; whereas, in this case the city owned its power plant and the payment was to be made out of the earnings of that power plant.

"Yet the contract in this case carefully and distinctly avoids that very contingency by making the payments solely out of the earnings of the Diesel engines purchased. The general revenue from the operation of a waterworks is not pledged to pay these installments. No special or general tax could be levied for the purpose of making those payments; they can be paid only from the revenue, the savings, derived to the city from the use of these engines purchased. What it cost the city per kilowatt hour without these engines is the measure by which this earning is to be determined. The difference is what the city saves each month by

220

■ We are of the opinion that the contract provides a reasonable basis for allocating the net earnings of the new power plant; that the installment notes are payable solely therefrom; that the contract does not create a debt within the meaning of section 26, art. 10, supra, and the provisions of the city's charter, and that it is valid and enforceable.

■ Fairbanks Morse was not a party to the suit of Zachary & Eby v. City of Wagoner, nor in privity with a party thereto; it was not represented by any one in the trial thereof; it did not directly or indirectly control or conduct the defense thereof. We conclude Fairbanks Morse is not concluded by the decree in the state court suit under the doctrine of res judicata.

■ The evidence established, and the trial court found that if the City had managed the electric utility economically and efficiently, and had operated the new power plant properly, the net earnings of the power plant during the period limited in the contract, would have been sufficient, without resorting to tax revenues directly or indirectly, to have paid the notes in full.

We conclude Fairbanks Morse is entitled to have the net earnings of the new power plant during the receivership, computed as provided in the contract and applied on the unpaid notes, from funds on hand or available to the receiver, and to have the receivership continued until such notes with accrued interest are fully paid from such earnings.

■ In computing the savings under the contract the receiver should deduct a reasonable reserve for depreciation.

■ The receiver should collect from the City the cost of electric energy which had been, and may hereafter be furnished, during the receivership, to the water utility, from any available earnings of the water utility, but not from funds derived directly or indirectly from taxation.

The decree is reversed and the cause remanded with instructions to enter a decree directing the receiver to pay over to Fairbanks Morse from funds on hand or available to the receiver, the net earnings of the new power plant, computed as provided in the contract, that have accrued, during the receivership, and to continue to operate the electric utility and to pay to Fairbanks Morse the future net earnings of the new power plant so computed until the remaining notes with accumulated interest have been paid therefrom in full.

The costs will be assessed against the City.

the use of the engines. Whether that method to which the parties resort in order to ascertain the 'savings' or earnings, is exact, or is capable of being applied, is not in question. Thus the monthly installments in this case are to be paid out of the earnings of the engines purchased, and nothing else, and the only remedy provided in the contract which the company has in case of failure to pay, is to retake the engines for failure to pay the purchase price."