JENKS *v.* PRODUCERS COAL CO.

(Decided April 2, 1929.)

*Mr. Raymond E. Manley,* for plaintiff.

*Messrs. Nichols, Morrill, Wood, Marx & Ginter,* for receiver of Producers Coal Company.

*Messrs. Taft, Stettinius & Hollister,* for Merrill Coal Mines, intervening petitioner.

*Messrs. Goodykoontz & Slaven,* for Pike Fuel Company, intervening petitioner.

*Messrs. French, Easley & Easley,* for Flat Top National Bank of Bluefield, intervening petitioner.

HAMILTON, J. This case is here on appeal from the court of common pleas of Hamilton county, Ohio. The defendant, the Producers Coal Company, a corporation, had engaged for several years in the wholesale coal business at Cincinnati, Ohio. It became insolvent, and, on August 5, 1927, Charlton C. White, one of the defendants herein, was appointed by the court of common pleas receiver of the company and took charge of its assets.

It appears that at the time of the appointment of the receiver the liabilities of the company were approximately $110,000, with claimed assets of between $45,000 and $50,000. The greater part of the assets consisted of accounts receivable, arising from the sales of coal made by the Producers Coal Company under its own name to its customers, which had not been collected at the time of the appointment of the receiver. Among these accounts receivable there was $25,813.35, arising from the sale of coal of the Merrill Coal Mines, Inc., a company engaged in mining coal at Henlawson, W. Va., and $3,289.05, arising from sale of the coal of the Pike Fuel Company, another mining concern whose coal was sold by the Producers Company.

These respective amounts are claimed by the Merrill Coal Mining Company and the Pike Fuel Company as their property, they claiming that they are no part of the assets of the Producers Coal Company.

By agreement of the parties the receiver was permitted to collect these accounts and hold the same pending the determination of the rights of the parties.

The Merrill Coal Mines, Inc., and the Pike Fuel Company filed intervening petitions, praying that the property in question be held to be the property of the intervening petitioners for the amounts respectively claimed, and that the receiver pay said sums to the petitioners.

The interveners claim the property under and by virtue of a certain contract, which they designate an "Agency Contract," entered into between the interveners and the Producers Coal Company.

The receiver, representing the general creditors, resists the claims, urging that the contract in question is a "Sales Contract," and that the contract as interpreted by the parties themselves, by their course of dealing, created the situation of debtor and creditor between the interveners and the Producers Coal Company, Inc., and that their only rights in the fund would be as general creditors of the Producers Coal Company, Inc.

The first consideration, therefore, is as to the meaning of the contract and its force and effect in law.

The contract is of such length that we will not undertake to set it forth in full. It consists of nine separate paragraphs, and throughout refers to the Producers Coal Company as the "agent" and the interveners as the "principals."

We will, however, consider the case under the claims of the Merrill Coal Mines, Inc., without further reference to the Pike Fuel Company, since the decision with reference to the Merrill Coal Mines will control the Pike Fuel Company claims.

The first paragraph of the contract provides that the "agent" is to use its best efforts to obtain orders for sale and delivery of spot and future coal, and certain conditions are enumerated, which are not important.

The second paragraph provides for the obtaining of mine quotations, prices, terms, etc., of spot coal in certain quantities.

The third paragraph provides for the future delivery of coal and provides that the "agent" shall not enter into any such contract as would bind the mine until the same is approved in writing by the executive officer thereof.

The fourth paragraph is of importance, and is in full as follows:

"4. As to any contracts so submitted and accepted, and as to shipments made thereon, the agent shall, except as hereinafter provided, collect the amount due thereon, and shall remit to the mine on the 25th day of each month for all coal shipped the preceding month, and as to the payment of all amounts due the mine by any purchaser of spot coal sold by the agent, or any contract obtained and submitted by the agent and accepted by the mine, the agent unconditionally guarantees that the purchase price of the coal so shipped will be paid to the mine, and in the event that same is not paid to the mine promptly when due, there shall be a direct obligation upon the agent to pay same out of its own funds to the mine."

Paragraph 5, among other things, reserves the right in the Mining Company to notify the agent of its desire to bill and collect for coal direct, and the "agent" shall permit the same and render all necessary aid in making collections. That is, if the mine elects to collect direct, the obligations or guarantees on the part of the "agent" shall terminate.

Paragraph 6 provides that this appointment of the agent does not give the agent the exclusive right to represent the mine to sell its product.

Paragraph 7 provides a schedule for what is called the agent's commission of 8 per cent. on the gross purchase price for the order or contracts for less than 10 cars, and 5 cents per ton on all orders or contracts in excess of 10 cars.

Paragraph 8 provides that the contract shall take effect as of November 1, 1926, and shall continue as long as mutually agreeable to the parties.

Paragraph 9 provides that this contract shall be construed and enforced in accordance with the laws of the state of Virginia, and that the contract shall constitute the entire agreement between the parties.

It will be seen that on the face of the contract, with its many conditions and terms, there arises a serious question as to whether or not the contract is a "Sales Contract" or an "Agent's Contract."

There are many statements in the contract which would bear directly on and indicate the relationship of principal and agent. There are other terms in the contract, as especially shown under paragraph 4, herein quoted, under which the law would imply a "Sales Contract." It would seem the contract was drafted with an eye single to the protection and benefit of the Mine Company absolutely and in all events, as against purchasers, agents, consignees, etc., regardless of the rights of any third parties that might arise.

Under paragraph 4, quoted, the agent unconditionally guarantees that the purchase price of the coal so shipped will be paid to the mine, and in the event that it is not paid promptly, the obligation is placed upon the so-called agent, the Producers Coal Company, Inc., to pay the same out of its own funds to the mine.

There is also a provision that the Mining Company, if it did not desire to look to the Producers Coal Company, could notify that company that it preferred to rely on the credit of the purchaser.

It will be noted the contract further requires the so-called agent to collect the amount due on the shipments and remit it to the mine on the 25th of each month, for all coal shipped the preceding month.

In view of these various provisions, which are difficult of reconciliation, we are compelled to examine the course of dealing from which these accounts were created.

Certainly, under the terms of the contract, the Producers Coal Company was not a factor, since at no time were there any goods consigned or delivered to it. Neither do we see how it could be designated a *del credere* commission. There is nothing in the contract or the conduct of the parties to show any additional payment or consideration for guaranteeing payment. The direct obligation on the part of the Producers Coal Company to pay the purchase price of the coal under certain circumstances is inconsistent with that of an ordinary sales agency. The manner in which the accounts were created and treated by the interveners and the Producers Company is disclosed by the evidence in the record, and is as follows:

The Producers Coal Company sold coal direct to the customers under its own name. It thereupon charged the price of the coal on its books to the people to whom it sold the coal. It kept no separate account of the funds derived from the sale of Merrill coal different from the account kept for the sale of any other coal it handled. Its funds were all kept in one account, in the general bank account. After the sale of coal to the buyer, the Producers Coal Company sent to the Merrill Coal Mines, Inc., an order, in form as follows:

"Order.
"Producers Coal Company.
"Exclusive Shippers 'The Distinctive Brands.'
"Main Office, Union Central Building, Cincinnati, O.

"Southern Office, Law & Commerce Bldg. Bluefield, W. Va.

> "Order No. 18642
> Office Cinti, Ohio.
> Date 7/15/27.

"To Merrill Coal Mines.  Gentlemen:

"Please ship for our account as follows:

"Consignee, Bennett Fuel & Ice Co.,

"Shipments Date, Initial, Number.

"Destination, Grand Rapids, Michigan, ·

"Route, Penn

"Quantity 2 cars

"Kind of cars Cross Pocket Hoppers

"Grade Island Creek N. & S.

"To be shipped, Week of July 18th

"Price $1.01 Sp $1.10

"Remarks Order 1232

"If for any reason you cannot fill this order as directed above, please advise by return mail. Your failure to so advise will constitute acceptance.

> "Yours very truly,
>> Producers Coal Company,
>> D. H. Jenks, President.
> "Office Information."

Thereupon the coal was shipped by the Merrill Coal Mines, Inc., to the consignee designated in the Producers Coal Company's order, and the account was charged on the books of the Merrill Coal Mines to the Producers Coal Company at the price named in the order.  The Producers Company thereupon billed the purchaser direct and proceeded with the collection of the account.  The Vice-president and general manager of the Merrill coal mines testified as follows:

"Q. During business dealings between the Merrill Coal Mines, Inc., and the Producers Coal Company, the Producers Coal Company sold this coal in its own name—you are familiar with that? A. As far as I know they did. * * *

"Q. They sold it outright in its own name? A. As far as I know they did.

"Q. And billed the coal to its customers in that way? A. Yes.

"Q. The same as they would for any coal that they bought outright? A. Yes.

"Q. You kept no record in your books of account as to whom the coal was sold and what was owing for it, did you? A. Well, we kept a record who it was shipped to—the name of the party and car number and initials.

"Q. Your shipping records disclose that? A. Yes.

"Q. But I mean in your books of account of debits and credits, there is nothing to show to whom the coal was sold or how much the people that bought it from the Producers had paid for it or on account of it? A. No.

"Q. And at the time of the appointment of the receiver for the Producers Coal Company you had no knowledge from your records as to what accounts receivable the Producers Coal Company had arising from the sale of your coal? A. No.

"Q. And you learned that subsequent to the appointment of the receiver by an examination of the books of the Producers Coal Company? A. I don't know if it was subsequent or not. I think it was after the receiver was appointed.

"Q. Well, that is what I meant—after the re-

ceiver was appointed you had your auditors make an examination of the Producers Coal Company's books of account? A. Yes.

"Q. And from the report made to you by the auditor you first learned as to what accounts receivable the Producers Coal Company had which arose from the sale of your coal? A. Yes."

The record further discloses that the Producers Coal Company undertook to comply with the settlement terms of the contract and settle on the 25th day of each month for coal shipped the preceding month; that settlement was made partly by check and partly by trade acceptances, drawn by the Merrill Coal Mines upon the Producers Coal Company, and accepted by the coal company. These trade acceptances contained this language:

"The obligation of the acceptor hereof arises out of the purchase of goods from the drawer. The drawee may accept this bill payable at any bank, banker or trust company in the United States which he may designate."

In the face of these facts, as herein indicated, it might be said that the parties by their conduct had practically thrown over the contract and were operating on a purchase and sales basis. However that may be, enough has been said to show that the parties treated the contract as a "Sales Contract," and, whether it is or is not necessary to construe the contract to that effect, it is clear that by their conduct the parties created the relationship of debtor and creditor.

If we limit these considerations to the wording of the contract to determine the question herein involved, the contract provides that it shall be con-

strued in accordance with the laws of the state of Virginia. A similar contract involving a like question arose in the case of *Arbuckle* v. *Gates*, 95 Va., 805, 30 S. E., 497, in which the court observed:

"The agreement was an attempt to accomplish that which cannot be done—to make a sale of personal property, and at the same time constitute the buyer simply an agent of the seller to hold the property until it is paid for. The two things are incompatible and cannot co-exist. The agreement had in it every element of sale. It was, in substance and effect, a sale and must be so declared. It does not matter by what name the parties chose to designate it. That does not determine its character. The courts look beyond mere names, and within, to see the real nature of an agreement, and determine from all its provisions taken together, and not from the name that has been given to it by the parties or from some isolated provision, its legal character and effect."

In addition to this declaration of the law of Virginia on a similar question, we have, as heretofore stated, the conduct of the parties, which carries with it every element of a sale of goods, and the creation of the relationship of debtor and creditor.

We do not deem it necessary to go into a more extended discussion.

We find the relationship between the intervener and the Producers Coal Company was that of debtor and creditor, and that the intervener is not entitled to any preference over the general creditors of the Producers Coal Company, and the relief sought will be denied. The intervening petition will be dismissed.

The same decree may be entered in the case of the Pike Fuel Company.

*Decree accordingly.*

CUSHING, P. J., and ROSS, J., concur.