COUNTRY CLUB DISTRICT SERVICE COMPANY
v. VILLAGE OF EDINA.
ST. PAUL FIRE & MARINE INSURANCE COMPANY,
INTERVENER.[1]

January 2, 1943.

No. 33,052.

[1]Reported in 8 N. W. (2d) 321.

*Stinchfield, Mackall, Crounse & Moore, Clarence Holten,* and *Karl H. Covell,* for appellant.

*Vennum, Miller & Acker* and *G. A. Youngquist,* for respondent.

*Oppenheimer, Hodgson, Brown, Donnelly & Baer,* for intervener.

28

PIRSIG, JUSTICE.

Action to recover for services rendered by plaintiff for defendant through the use of fire hydrants and storm sewers.

In 1922 Thorpe Bros., a corporation engaged in real estate business, purchased a 300-acre tract of land known as Browndale Farm in the village of Edina located outside of, but adjacent to, the southwest end of the city of Minneapolis. It proceeded to convert the tract into a suburban residential district. The area was platted into the Brown Section, on the west, and the Fairway Section, on the east, and the whole was called the Country Club District. In order to dispose of the lots as planned, it was necessary to provide for the installation of modern improvements such as water and sewerage systems, light, gas, etc. We are concerned here only with the water and storm sewer systems. The storm sewer in the Fairway Section was installed by defendant village and is not involved in the present litigation. To provide these facilities, Thorpe Bros. organized the present plaintiff in 1923. To it, defendant, the village of Edina, issued water and sewer franchises authorizing the installation and operation of water and sewer systems. From the beginning, however, plaintiff remained inactive, and the installation of the systems, their later maintenance, and the rendering of water and sewer services was under the direction and supervision of Thorpe Bros. Only three shares of stock of plaintiff were issued, and these were to three members of the firm of attorneys who had charge of the organization of plaintiff. No consideration was paid to the corporation for them. They were later transferred to members of the Thorpe Bros. organization. Contracts for the installation of the water and sewer systems were, with one exception, in the name of Thorpe Bros., and in the one instance in which the contract ran in the name of plaintiff it was guaranteed by Thorpe Bros. The contractors who installed the systems were paid by Thorpe Bros. out of their own funds, and this was charged to an expense account kept by them in connection with the development of the lots. Water

furnished to the residents was obtained from the city of Minneapolis under a contract made in the name of Thorpe Bros.

After the improvements were about completed, Thorpe Bros. began an aggressive advertising campaign for the sale of the lots. In this campaign attention was directed particularly to the improvements which had been installed, and it was emphasized that they "were fully paid for." Typical statements held before prospective buyers and the public were that "the purchase of a homesite in the Country Club District carries with it, all the modern improvements—paved streets * * * water, * * * and sewage. There are no improvement assessments to follow," "nor will he [the buyer] have improvements assessed against his property at a later date"; "water and sewer are provided, you will never be bothered with any assessments for any of these improvements. They are paid for: The original cost of the Home-Site includes all your obligations." Examples of such advertisements, introduced in evidence, cover the period from June 1924 to August 1927. Similar statements appeared in pamphlets which were distributed. Under instructions from Thorpe Bros., similar statements were made by salesmen in their negotiations with prospective buyers. Some of the buyers appeared at the trial. They testified that they relied upon such representations as those set out above. The evidence is clear that in fixing the price of the lots the cost of these improvements was proportionately included.

During this period numerous residences were erected, and these were connected to the water and sewer systems. Charges for water and sewer service were made to the residents. Statements therefor were made out in the name of plaintiff, but they were prepared and sent out by Thorpe Bros. Moneys received in payment of them were deposited by Thorpe Bros. in their own account in their own name. During this period plaintiff had no account of its own. Similarly, the two systems were maintained and operated by Thorpe Bros. by the use of their own funds and employes.

During this period no claim was made by anyone against defendant for any services rendered in connection with the fire

hydrants, the storm sewer, or any other service connected with these systems.

As the lots were sold and homes erected upon them, the burden of supplying the water and sewer services increased, and, as this burden increased, the primary interest of Thorpe Bros. in the project was reduced as the lots were sold. Until 1932 the residents were charged no more for their water than was paid by Thorpe Bros. to the city of Minneapolis. To offset losses sustained, the price was increased in 1932 and again in January 1935. The residents were informed that the increase was to cover the cost of "repairs to hydrants, * * * flushing sewers," and other items.

The residents also became dissatisfied. They wanted better service at lower rates. An organization of them had a so-called water committee to deal with the problem. By 1933 Thorpe Bros. were ready to dispose of their interest in the systems. In February 1933 they offered to donate the storm sewer to the village if it would accept and operate it. In 1934 and 1935 they offered to sell their interest to the residents' organization. In an offer made in 1933, they listed their original investment in the water system at $70,000. Of this, $50,000 was listed as "installation of pipe line in the district," which had been "prorated and added to the price of the lots, about 70 percent of which have been sold. Thorpe Bros. therefore have received that part of their original investment back." They stated further that the water tank and a Fiftieth street main had not been included in the lots. Their total unrepaid investment in the water system was listed at $35,000. They offered to sell the system for $15,000 cash or for $20,000 on a deferred payment basis. The storm and sanitary sewer systems they offered to turn over without charge.

While these various negotiations were going on, one Oscar Gaarden, who was first a member of the water committee and later its chairman and as such took an active part in the negotiations, decided in the fall of 1935 to buy the systems for himself. An agreement, reached between him and Thorpe Bros., was incor-

porated in an instrument which provided for the purchase of the systems by a manipulation of the stock of the plaintiff. When executed and performed, it left Thorpe Bros. holding 153 shares of preferred stock of the par value of $100 and 98 shares of common stock. Gaarden had purchased 20 shares of preferred stock from plaintiff for $2,000 cash, and Thorpe Bros. had purchased an additional 10 shares for $1,000 cash. Then, for the first time, plaintiff had funds of its own, consisting of $3,000 cash. Gaarden had control of plaintiff by his ownership of 102 shares of common stock. Other than stated, no consideration passed to plaintiff or between the parties.

Later, plaintiff retired 63 shares of preferred stock by paying Thorpe Bros. $6,300, and Gaarden purchased the remaining 100 shares held by them. At the same time Thorpe Bros. transferred the 98 shares of common stock held by them to Gaarden without further consideration. From and after 1938, by these transactions, Gaarden was the sole party interested in plaintiff.

On acquiring his interest in the plaintiff, and through it in the water and sewer systems here involved, Gaarden's concern was in getting a return on the investment he had acquired. He had no lots to sell in connection with which it might be to his advantage to continue the services without profit or at a loss. He demanded of the village that it pay for the services which had been rendered in connection with the storm sewer system and the fire hydrants. His claim was not merely for the services rendered subsequent to the time he acquired his interest, but for the entire period from the time the systems were put into operation. Negotiations with the village failing, the present suit followed.

After an extended trial, the lower court found for plaintiff and allowed recovery for the six-year period prior to the commencement of the action. The court found that the village had granted a water franchise to plaintiff which plaintiff accepted; that in accordance therewith plaintiff furnished fire protection service to the village and residents thereof; that, among other things, hydrants and connections were installed, operated, and maintained

during the period, for which recovery was allowed, and that the same had been used and relied upon by the village and its residents at all times for fire protection purposes; that plaintiff's efforts throughout the period to reach an agreement with the village on the fair and reasonable hydrant rental had failed and that no payment had been made. The reasonable rental value of the hydrants also was stated. Similar findings were made with respect to the storm sewer system. In its conclusions of law the court held that plaintiff was and at all times had been the owner of the pipes, hydrants, mains, and other items of the systems and that neither the village nor any lot owner or resident nor any other person had any right, title, or interest therein, and that plaintiff is entitled to the reasonable hydrant rental and storm sewerage service charge therein stated.

The question is whether these findings and conclusions can be sustained. We hold that they cannot be. They are permeated in part by a failure to give sufficient recognition to the undisputed facts in the case and in part by a failure to apply the correct principles of law which govern. When findings of fact are couched in general terms that anticipate the result and disclose that they are colored by an erroneous conception of the law applicable, this court will not give them the weight to which they are ordinarily entitled. In re Trust under Will of Holden, 207 Minn. 211, 227, 291 N. W. 104. That is particularly true when, as here, more specific findings were requested and refused.

As the findings stand, they fail to give the required legal effect to the representations made by Thorpe Bros. when the lots in the Country Club District were sold. The people of this district were told when they purchased the lots that the price they were paying included a proportionate charge for repayment of the expense of putting in the various improvements. There were no assessments to be feared. In reliance thereon they paid, and Thorpe Bros. received, an amount which, by their own statement in 1933, had repaid them 70 percent of the cost of the pipe lines. It would be a patent fraud upon the community if these people should now be

compelled, as members of the village, to contribute to the payment of hydrant and storm sewer services on a basis which assumes that these systems are still entirely owned by plaintiff and that plaintiff is entitled to a return on their full value.

There is no legal principle or authority that leads to that result. True, the cases on the subject are few and not satisfactory. Most of them involve the effect on the systems involved of a subsequent annexation by the adjoining city of the suburban area. The question raised in them is whether the annexation constituted an appropriation of the water and sewer systems. In City of Danville v. Forest Hills Development Corp. 165 Va. 425, 182 S. E. 548, recovery for such an appropriation was denied on the ground that the cost thereof had been included in the purchase price of the lots sold. The court said (165 Va. 430, 182 S. E. 550): "when the water mains, pipes, etc., were constructed by the plaintiff as an inducement to the purchase of its lots, the plaintiff thereby dedicated said mains and pipes to the use of the lot owners, and has no right to claim adverse ownership in or remove same without such lot owners' consent." In Suburban R. E. Co. v. Incorporated Village of Silverton, 31 Ohio App. 452, 167 N. E. 474, and Ford Realty & Const. Co. v. City of Cleveland, 30 Ohio App. 1, 164 N. E. 62, recovery was similarly denied, but on the ground that (31 Ohio App. 457, 167 N. E. 476), "having sold the lots on the representation of furnishing water, and a means having been provided therefor, the Real Estate company would not be heard to claim ownership in the water mains, with right to remove the same."

The significance of these cases lies not so much in the analytical validity of the reasons given as in the fact that the basic sense of justice so appealed to these courts that they had no hesitation in deciding as they did. No cases to the contrary have been found. In Abbott Realty Co. v. City of Charlotte, 198 N. C. 564, 152 S. E. 686, and Stephens Co. v. City of Charlotte, 201 N. C. 258, 159 S. E. 414, cited by plaintiff, the facts do not show that representations of the kind here made were held out to purchasers of the lots sold

or that the purchasers had repaid any part of the cost of the improvements involved. In the Abbott Realty Co. case it distinctly appears that the claimant expected payment not from the buyer but from the adjoining city.

If a court is convinced of the justice of a cause, it cannot refuse to recognize and give effect to it merely because an applicable precedent or legal principle cannot be found. In the absence of authority, it must of its own develop and assert those legal principles which in its judgment will best serve the ends of justice in the case before it and in other like cases. Cases of the kind before us must stand on a footing of their own. When the residents of the Country Club District bought their lots and paid the purchase price agreed upon, they paid for something more than the real estate in the lots. When the statements made to them by Thorpe Bros. are taken into account, it is evident that they were paying also a sum which represented their contribution as owners of the lots to the reimbursement of Thorpe Bros. for the cost incurred in installing the improvements. They were not attempting to buy any specific share in the systems or any part of the mains and piping fronting their lots. For this reason, the deeds in the lots did not attempt to convey or transfer any interest in any property of the systems. But the plain understanding between Thorpe Bros. and the buyers was that they, the buyers, were contributing their share to the payment of the improvements, which were public in purpose and which were to serve the community as a whole. What they paid for the law should and does give them. To the extent of the repayment made to Thorpe Bros. in the course of the sale of the lots, the community acquired a public right in the property of the systems, and to that extent Thorpe Bros. could no longer claim that they owned the systems. The public right so acquired may be asserted by the local unit of government representing the community, in this case the village.

Implicit in the transaction is the right of plaintiff to use the systems without charge in the exercise of its franchises; but in claiming compensation for the service rendered the community

thereunder it cannot claim the right to a return on the basis that it is the full and exclusive owner of the systems. What the lot owners have paid for cannot be included. This the findings and conclusions of the lower court appear to have allowed, and hence they cannot be sustained.

Little significance can be placed on the fact that plaintiff was organized as a corporation separate from that of Thorpe Bros. From its original organization until 1935, plaintiff as a corporation was no more than a hollow legal shell. There were only three shares of stock outstanding, issued without consideration. Plaintiff had no funds, no active officers or employes, no property. Throughout that period, whatever was done was done by the members of Thorpe Bros. Plaintiff was only a convenient legal means by which Thorpe Bros. conducted part of its business in connection with the Country Club project. It is well settled that under those conditions the interposition of the corporate entity will not be permitted to conceal the truth of the transactions. What Thorpe Bros. and their employes did in connection with this project is attributable to plaintiff so far as its legal rights are concerned. Specht v. Missouri P. R. Co. 154 Minn. 314, 191 N. W. 905; In re Trust Under Will of Clarke, 204 Minn. 574, 284 N. W. 876; Penn A. M. Co. v. Clarkson Sec. Co. 205 Minn. 517, 287 N. W. 15; 1 Fletcher, Cyc. Corp. (Perm. ed.) p. 154, § 43.

"If a corporation is owned and controlled by another and is manipulated by the owner for its own purposes and in its own interests to the prejudice of innocent third parties, or the public welfare, it may be necessary to limit such abuse of the corporate capacity or shield." Ballantine, Manual Corp. L. & Pr. p. 37, § 6.

Hence plaintiff is as much bound by the legal consequences of the facts relating to the sale of the lots as was Thorpe Bros. The fact that Gaarden subsequently became the owner and holder of the stock in plaintiff corporation does not alter the result. It was still the same corporation. Moreover, the evidence is clear that Gaarden at the time he acquired his interest in the corporation was

36

aware that there was a dispute as to the status of the title to the water and sewer systems and so was put on notice of any possible claims that might be established.

The decision of the lower court cannot be sustained for a further reason. No contract, express or implied, was established on which the village can be held liable. There was no express contract under the franchises acquired from the village by plaintiff, for they merely "granted * * * the right and privilege to install, maintain and operate" the water and sewer systems and the "right" to erect and maintain "fire hydrants approved by said Village Council." By this language the village did not assume a liability. It only granted a right and a privilege. Much reliance is put upon the provision that "said hydrants may also be used by the Village of Edina for fire protection purposes upon such terms as may be mutually agreed upon between said Village" and plaintiff. But this merely looks to an agreement in the future and conditions the right to use the hydrants upon the reaching of such an agreement. No agreement was ever reached and, except for possible isolated incidents, the hydrants were not used by the village.

Neither was there any liability on the basis of quasi contract or contract implied in fact. The franchise was granted at the request of Thorpe Bros. Thereafter Thorpe Bros. installed the systems and provided water and sewer service, including the maintenance of the fire hydrants, in their own interest and for the purpose of rendering their lots more salable. Except as operating expenses were reflected in the water and sewer charges made to the residents, no claim was made against the village for these services for a period of 10 to 12 years, and not until Gaarden acquired his interest in plaintiff. When services are rendered for another in one's own interest and without expectation of reward, compensation cannot later be claimed on the ground of implied contract. Under those conditions, it is not an unjust enrichment for the recipient of the benefits to retain them without compensation. See Johnson v. Unorganized School Dist. 159 Minn. 226, 198 N. W. 463. Plaintiff, having originally rendered the services

in its own interest, cannot later, when its own purposes have been served, insist that the village accept and pay for the services which plaintiff thereafter continued to render. See Johnson v. Unorganized School Dist. *supra.* The findings and conclusions of law give no recognition to these principles and for this reason also cannot be sustained.

Much discussion was devoted here and in the court below to the question whether the original cost or the reproduction cost of the systems should be used in determining the amount of plaintiff's recovery. Both parties proceeded on the basis that a fair return on the portion of the investment represented by the hydrants and storm sewer should be ascertained by using one or the other of these tests as starting points and allowing recovery accordingly. No one seems to have considered whether these bases, ordinarily used in proceedings to fix utility rates (see State v. Tri-State Tel. & Tel. Co. 204 Minn. 516, 535, 284 N. W. 294) have any application where the basis of recovery is implied or quasi contract. Since plaintiff has not, under the principles stated, shown a right of recovery, the question is not considered further.

For the reasons stated, the judgment against the village cannot be sustained.

After Gaarden had acquired his interest in plaintiff he began improving and extending the water system. For this purpose he obtained a loan of $20,000 from intervener secured by a mortgage upon the water system. The funds obtained were used by plaintiff mostly for the improvement and extension of the water system outside of Brown and Fairway Sections. Intervention was allowed for the purpose of establishing the validity of the mortgage as against the claim of the village to ownership of the system.

Before intervener would make the loan it insisted that the water franchise held 'by plaintiff be amended by the village so that any title which the village might acquire to the property under the provisions of the franchise would be subject to the mortgage. It insisted further that a resolution be adopted by the village approving the mortgage. Both of these requests were complied with.

In reliance thereon the loan was made and the mortgage executed. The property described therein specifically included water mains and fire hydrants. There is a dispute over whether the full description of the property covered by the mortgage was before the village council when the mortgage was approved. The evidence thereon is sufficiently conflicting and doubtful to entitle the trial court to find as it did against the village. The court found also, and on sufficient evidence, that the village was barred by laches and was estopped from questioning the legality of the mortgage, either on behalf of itself or on behalf of the lot owners. The issue was one of fact. The court could properly find that intervener acted in reliance on the action taken by the village, and that the village so intended. The principles of estoppel apply. Thom v. Thom, 208 Minn. 461, 467, 294 N. W. 461; Barchent v. Selleck, 89 Minn. 513, 95 N. W. 455.

The claim that the amendment to the franchise authorizing the mortgage, as well as the original franchise, was invalid for failure to pay a compensation to the village therefor as required by Minn. St. 1941, § 300.03 (Mason St. 1927, § 7432) (see Duluth Terminal Ry. Co. v. City of Duluth, 113 Minn. 459, 130 N. W. 18, and Larson v. Minnesota N. W. Elec. Ry. Co. 131 Minn. 183, 154 N. W. 948), is without foundation for the reason alone that under the provisions of the franchise the village would acquire title to the entire system, including the improvements made from funds obtained by the loan, in case plaintiff failed or neglected to operate the same. This possibility the village was entitled to consider a sufficient compensation for the franchise under the circumstances of this case. Nor can the village at this late date claim the invalidity of the original franchise because it was granted without public bidding as required by Id. § 412.21 (§ 1199). Chisholm Water Supply Co. v. City of Chisholm, 205 Minn. 245, 285 N. W. 895; City of Staples v. Minnesota P. & L. Co. 196 Minn. 303, 265 N. W. 58.

It follows that the decision of the trial court so far as the intervener is concerned cannot be disturbed. This leaves open for con-

sideration, however, should the question arise, whether the village, in the event of a foreclosure of the mortgage, may insist that those portions of the water system, in the improvement of which the funds obtained by the loan were used, should first be subjected to the payment of the mortgage before resort is had to the portion of the system located in Brown and Fairway Sections. Whether the equitable doctrine of marshaling assets and securities, or related principles, apply is not decided.

Numerous other questions have been raised by the parties. They are not discussed, either because they have become immaterial in view of the disposition made herein, or because the answer to them is made obvious by the application of what has been said so that explanation is unnecessary. Nor should we unduly lengthen this opinion by discussing each of the multitudinous assignments of error covering, in condensed form, 30 pages of appellant's brief, or all of the legal points argued in 600 pages of briefs of the parties. Discussion has been confined to those issues which are deemed controlling.

Judgment affirmed as to intervener and reversed as to plaintiff.