**624**

John L. TRENTMAN, Harry C. Trentman, and Aubrey Milner, a co-partnership, Plaintiffs,

v.

The CITY AND COUNTY OF DENVER, COLORADO, a municipal corporation, a Defendant,

and

Board of Water Commissioners of The City and County of Denver, Colorado, et al., Defendants and Third-Party Plaintiffs (Sam H. SCHAEFER, Third-Party Defendant).

Civ. A. No. 2686.

United States District Court, D. Colorado.

March 11, 1955.

Bernard E. Engler, Henley A. Calvert and Barkley L. Clanahon, Denver, Colo., for plaintiffs.

John C. Banks and Willard S. Snyder, Denver, Colo., for defendants and third-party plaintiffs.

Allen A. Schaefer, Denver, Colo., and Darwin D. Coit, Denver, Colo., for third-party defendant.

WALLACE, District Judge.

The plaintiffs, Aubrey Milner and Harry C. Trentman,[1] citizens of Texas, bring this action against the City and County of Denver, Colorado, a municipal corporation and the Board of Water Commissioners of the City and County of Denver, Colorado, all citizens of Colorado, to recover damages for the alleged conversion of two domestic water systems owned and formerly operated by the plaintiffs. Plaintiffs, in their first count, seek $107,-407.66 for the Trent-Milner Water Sys-

1. One of the original plaintiffs, John L. Trentman, a Kansas citizen, has passed away since the institution of this suit.

tem (herein referred to as Bel-Adams System) ;[2] and, in their second count ask for $72,962.21 for the Schaefer Water System (herein referred to as Schaefer System).[3]

The defendants in answering deny they have converted property owned by plaintiffs; and, defendant Water Board counterclaims against plaintiffs to collect $790.12, plus interest, for an unpaid water bill. In addition, defendants have filed a third-party complaint against Sam H. Schaefer and ask to be indemnified for any judgment rendered against them as to the Schaefer System for the reason said System was sold to them by Schaefer under a warranted title.

The evidence applicable to plaintiffs' first cause of action indicates that plaintiffs began selling lots in the subdivisions which formed the first part of the Bel-Adams System in July of 1924. In promoting the sales of such lots plaintiffs advertised that water would be available;[4] and, in consummating sales used contracts which provided that purchasers pay $25 per 25 foot lot for water mains.[5] Under such contracts deeds were not given to the buyers until the complete purchase price, and the water main charges were paid. Subsequently, various subdivisions were added to the territory served by the Bel-Adams System.[6] The same technique was employed in the development of these later subdivisions with the exception that several of the later subdivisions were not promoted on the basis of separate charges for water mains.[7] However, the availability of water was publicized; and, its presence was reflected in a higher sales price.[8]

The evidence dealing with plaintiff's second cause of action which involves the Schaefer System indicates this System was installed in connection with the subdivision and sale of lots in Kentucky Gardens, Kentucky Gardens Annex, Westlawn and Preston's Addition. The first of these lots were sold by third-party defendant Sam Schaefer and plaintiff Milner, beginning in 1937. No separate charges for water mains were made to purchasers of lots in the just-mentioned subdivisions. However, in selling these lots served by the Schaefer System, the sellers advertised that water service was available and the purchasers took such representations into account in making their purchases. The expense of installing mains to serve the tracts under the Schaefer System was added to the price of the lots and was charged off as

2. Originally, this system was known as the Bel-Adams Water System.

3. Originally, this system was known as the Milner-Schaefer Water System.

4. Illustrative of this was a five column advertisement in the September 12, 1926, issue of the Denver Post, wherein as to Belmont Park it was stated: "Water In Front of Every Lot." Also, see various leaflets used in advertising lots in Adams Park Annex, Bel-Adams City and Adams Garden.

5. For example, the pass book of a purchaser of lots in Belmont Park in 1924 contained the following provision: "In the event Trentman-Milner Company as agents for the sellers extends water lines to lot or lots covered by this contract, it is then agreed that the buyers shall pay the Trentman-Milner Company the sum of $25.00 for each lot covered by this contract at the time a tap is made on said water line, on or before or at the time the deed is executed."

Also, Witness Sam Schaefer testified that the purchasers of lots paid for the water meters which were installed. For corroboration of this see the three Plattner Manufacturing Company construction and operating contracts.

6. Subdivisions wherein lot purchasers paid a separate price per lot for water main installation include Belmont Park, Belmont Park Annex, Adams Park, Adams Park 2d Filing, Adams Park Annex and Adams Garden.

7. Such included Federal Park and Westwood Park.

8. The cost of extending water mains in the Bel-Adams System to Federal Park was charged off as tract expense and was added to the price of the lots. In all additions, the meters and pipelines extending from the water mains in the streets to the hydrants (usually located in the yards) were purchased and paid for by the lot owners.

a tract expense.[9] As in the case of the Bel-Adams System, the purchasers of lots served by the Schaefer System paid for the meters and service lines leading from the water mains in the streets to their own property.

From 1928 until May 1, 1947, the City and County of Denver furnished water to the plaintiffs, which was resold by plaintiffs to the Bel-Adams consumers. Originally, the Schaefer System was supplied with water from its own well located in Kentucky Gardens. Subsequently, and for years prior to the annexation of all the land involved in this controversy on March 27, 1947, the Schaefer System was served by water obtained from the City and County of Denver.

At the time of annexation of the lands served by both the water systems in question, the Denver Water Board sent notices to the consumers stating that water would be sold at Denver rates directly to the various customers and that all water bills should be paid at the office of the Denver Water Board. The plaintiffs have neither protested the City's policy to directly supply water to the consumers nor made any effort to retain or regain control of either water system.

In light of the just-summarized facts the Court has concluded that plaintiffs are not entitled to recover from the defendants on either of the two counts (or causes of action) for the following reasons:

1. Plaintiffs possess no such interest in either of the two instant water systems to support an action for conversion inasmuch as the beneficial interest in such systems was either sold to the property owners in the various additions when they purchased the lots;[10] or, such systems must be deemed dedicated to the public use in the areas in question.[11]

---

9. For example, a part of the consideration for the contracts with the owners of Kentucky Gardens and Preston's Addition was the agreement that water mains would be installed to serve these two subdivisions.

10. Read in particular fns. 5, 8 and 9, supra, and findings in connection therewith. Also, cf. Country Club District Service Co. v. Village of Edina, 1943, 214 Minn. 26, 8 N.W.2d 321, 325, 326, where the Court said: "* * * When the residents of the Country Club District bought their lots and paid the purchase price agreed upon, they paid for something more than the real estate in the lots. When the statements made to them by Thorpe Bros. [sellers] are taken into account, it is evident that they were paying also a sum which represented their contribution as owners of the lots to the reimbursement of Thorpe Bros. for the cost incurred in installing the improvements. They were not attempting to buy any specific share in the systems or any part of the mains and piping fronting their lots. For this reason, the deeds in the lots did not attempt to convey or transfer any interest in any property of the systems. But the plain understanding between Thorpe Bros. and the buyers was that they, the buyers, were contributing their share to the payment of the improvements, which were public in purpose and which were to serve the community as a whole. What they paid for the law should and does give them. To the extent of the repayment made to Thorpe Bros. in the course of the sale of the lots, the community acquired a public right in the property of the systems, and to that extent Thorpe Bros. could no longer claim they owned the systems. * * *" Significantly, in the case at bar the evidence is convincing that plaintiffs have more than received back the amount they invested in installing the two systems in question.

Also, cf. Royal Oak Township v. City of Ferndale, 1944, 309 Mich. 458, 15 N.W.2d 707, 709, 710: "It is important to consider the character of ownership or of right of control that the township had in the water mains in suit at the time of annexation, and the character of such ownership or right of control, if any, that passed to the defendant city as the result of the annexation. We have already stated that the portion of the township water system in the annexed area was paid for with money obtained from property owners to whom the service was to be rendered. Under such circumstances we do not think it can be said with accuracy that the water system when installed became the property of the township in the sense that it was the absolute beneficial owner of the same. * * *"

11. As stated in City of Danville v. Forest Hills Development Corp., 1935, 165 Va. 425, 182 S.E. 548, 550: "* * * It,

2. Apart from the issue of ownership there has been no taking or appropriating of the property in question so as to amount to an act or acts of conversion by the defendants.[12]

Defendant Water Board is entitled to judgment on its counterclaim for $790.12, plus interest at 6% per annum from May 1, 1947.

In light of the Court's expressed views it is unnecessary to discuss any of the other features of this case which were raised at the time of trial and dealt with in the submitted briefs.

Within 15 days counsel should submit a journal entry which conforms with this opinion.

**Myrtle I. McGREW, Plaintiff,**

v.

**Oveta Culp HOBBY, Secretary, Department of Health, Education and Welfare, United States of America, Defendant.**

**Civ. A. No. T–899.**

United States District Court,
D. Kansas.

March 11, 1955.

moreover, seems plain that when the water mains, pipes, etc., were constructed by the plaintiff as an inducement to the purchase of its lots, the plaintiff thereby dedicated said mains and pipes to the use of the lot owners, and has no right to claim adverse ownership in or remove same without such lot owners' consent." Also, as observed in Suburban Real Estate Co. v. Incorporated Village of Silverton, 1929, 31 Ohio App. 452, 167 N.E. 474, 476: " * * * We are of opinion that, having sold the lots on the representation of furnishing water, and a means having been provided therefor, the Real Estate Company would not be heard to claim ownership in the water mains, with right to remove the same." See, also,

Ford Realty & Construction Co. v. City of Cleveland, 1928, 30 Ohio App. 1, 164 N.E. 62.

12. As mentioned in the Ford Realty & Construction Co. case, footnote 11, supra, 164 N.E. at page 63: " * * * But aside from this, if the Ford Realty & Construction Company owned title to these pipes at that time, they own it now, and there is nothing to prevent them from taking them, if their position is right." Read, also Suburban Real Estate Co. v. Incorporated Village of Silverton, footnote 11, supra, 167 N.E. at page 476; Hightower v. City of Tyler, Tex.Civ.App., 1939, 134 S.W.2d 404; South Memphis Land Co. v. City of Memphis, 1932, 18 Tenn.App. 142, 74 S.

**628**

Myers, Gray & Hall, Topeka, Kan., for plaintiff.

Selby S. Soward, Asst. U. S. Atty., Topeka, Kan., for defendant.

W.2d 209; and, Wilkinson v. City of Shreveport, 1936, La.App., 165 So. 471.

This Court in reviewing the many authorities dealing with the problem at hand wholeheartedly agrees with the observation made by the Court in the Country Club District Service Co. case, footnote 10, supra, 8 N.W.2d at page 325: "The significance of these cases lies not so much in the analytical validity of the reasons given as in the fact that the basic sense of justice so appealed to these courts that they had no hesitation in deciding as they did. * * *"