CITY OF TULSA v. LANGLEY.

No. 30672.    April 16, 1946.

*168 P. 2d 116.*

E. M. Gallaher, John W. McCune, Thos. I. Munroe, and C. Lawrence Elder, all of Tulsa, for plaintiff in error.

Duff & Manatt, of Tulsa, for defendant in error.

DAVISON, J. This is an action by Harve N. Langley, as survivor of the partnership of Langley & Langley, attorneys, to recover a money judgment against the city of Tulsa for the alleged value of legal services asserted to have been rendered that municipality pursuant to agreement.

The cause was instituted and prosecuted to judgment in the district court of Tulsa county. It was tried to the court without the aid of a jury. The judgment was against the city for the principal sum of $14,100.

The defendant city appears before this court as plaintiff in error, thus reversing the order of appearance. Our continued reference to the parties will be by their trial court designation.

The asserted indebtedness upon which the judgment of the trial court rests is connected with the acquisition of a source of water supply by the city of Tulsa, which owns and operates its own water system.

In July of 1921, a bonded indebtedness of $25,000 was approved by the qualified property tax-paying voters of the city for the purpose of providing funds to determine whether Spavinaw creek, located in Mayes and Delaware counties, and about 60 miles from the defendant city, was a feasible and practical source of water supply. Thereafter, in February of 1922, an additional bonded indebtedness of $6,800,000 was approved by the properly qualified voters of the city to extend the waterworks system and acquire the source of water supply on Spavinaw creek.

The water commission of the city of Tulsa, which was then the governing board of the municipal water plant, decided to avail itself of the legal services of the partnership of Langley & Langley, located at Pryor, in Mayes county, which will hereinafter be referred to as plaintiff. The commission authorized one of its members, Cyrus S. Avery, to open negotiations with the plaintiff firm with a view to procuring its services in connection with the acquisition of the water rights on Spavinaw creek and the acquisition of property for use in connection with the water supply system and other incidental legal services.

In May of 1922, an agreement was made whereby the plaintiff firm was employed to perform the contemplated legal services, the same to be paid for in accord with the value thereof. There was no definite agreement as to the amount to be ultimately paid. The understanding was that as services were performed the water commission was to be "billed" and claims to be filed in accord with the reasonable value of the services rendered. The general nature of the agreement is reflected by the record of the action taken by the water commission on the matter and by oral testimony produced at the trial. Mr. Avery testified:

"Q. In other words, they were to be paid for according to whatever they were worth? A. That is right. I think I told Mr. Langley if it was too high, we would cut it down, if it was too low, we would not say anything about it."

And Mr. Langley, the surviving member of the partnership, testified:

"A. Well, the conversation was substantially this: That the city commission, water commission, needed the services of local counsel there in the acquisition of rights of way and acquisition of adequate water right on the creek and that it was a new endeavor and there was no measuring stick by which services may be gauged in advance and he said it correctly awhile ago, as I recall, because I added several claims we filed, that 'if your claims are too high we will cut them down and if they are too low we will let them alone.' "

Mr. Langley also testified that serv-

ices for which recovery was sought in this action were all rendered pursuant to the foregoing agreement of May, 1922, and that no other contract or agreement was made with the city in the subsequent years throughout which the services were rendered.

There is considerable testimony in the record describing specifically and in detail the services performed for which recovery is herein sought. These services consisted of an investigation of the law with reference to the acquisition of water rights; taking the necessary steps, administrative and legal, to acquire those rights; and finally the institution, prosecution, and subsequent favorable termination of litigation to bar other adverse or possible adverse claimants.

The legal action to confirm and adjudicate the rights of the municipality in and to the water was instituted in February of 1934 and terminated by judgment in February of 1938. No appeal was taken and the judgment of the trial court in that action became final.

There is ample testimony in the record supporting the view of the trial court that the services of the plaintiff connected with the acquisition of water rights extending from 1922 to 1938 were reasonably worth the sum of $15,000. The record reflects that four partial payments for these services were made as follows: October 6, 1932, $250; June 29, 1934, $200; July 12, 1935, $200; July 1, 1937, $250; making a total of $900 paid and leaving a balance due of $14,100.

In March of 1939 plaintiff prepared a claim for the fee, reciting in detail the services rendered. The same was submitted to the defendant city and disapproved. Thereafter this action was commenced.

Incidentally, it is proper to observe at this point that pursuant to the agreement of May, 1922, the plaintiff performed and was paid for other legal services not directly connected with the acquisition of water rights, which other services and payments for the same are not a subject of dispute in this action.

Additional details in connection with the facts will be interpolated in our subsequent discussion of the legal questions involved in this appeal.

As we understand the briefs, the parties are in agreement that the evidence supports the trial court's view that the services rendered were reasonably worth the sum of $15,000. It is the position of the defendant city that regardless of the worth of the services it cannot legally pay for them.

It is first urged that: "No valid contract of employment existed between the defendant in error and the city of Tulsa." Under this proposition the defendant city urges in substance that the water commission had no authority to make the agreement here involved for and on behalf of the city of Tulsa. The theory seems to be that the authority to make such an agreement for the municipality rested exclusively with the board of commissioners of the city. In support of this position the city relies upon United States Rubber Co. v. City of Tulsa (1924) 103 Okla. 163, 229 P. 771. In that case (which involved the attempted purchase in 1919 and 1920 of fire hose for the fire department of the city) one of several commissioners, acting pursuant to an understanding between himself and other commissioners, but without formal action upon the part of the commissioners convened as a body, undertook to bind the city by contract. In declaring the contract invalid we attached controlling importance to certain provisions of the charter of the city and pointed out that such charter provisions were ignored by the manner in which the commissioner attempted to obligate the city upon contract.

In the case at bar the members of the water commission did not as individuals undertake to authorize one of their members to act individually in a capacity in which the commission should act when convened as a board.

Mr. Avery as a member of the water commission conducted only preliminary negotiations with the plaintiff. Thereafter the water commission when properly convened considered the matter of making the agreement and by the vote of a majority of its members approved the arrangements. The record of the proceedings of the water commission reflect the action taken.

Now let us consider the authority of the water commission to act. The case of United States Rubber Co. v. City of Tulsa, supra, is authority for the view that we may look to the provisions of the charter for guidance. Under our State Constitution (art. 18, § 3) cities of the state over 2,000 in population may form and adopt charters which are of governing importance in their local affairs when and insofar as they are consistent with the requirements of our Constitution and the general laws of the state. The city of Tulsa has adopted such a charter. City of Tulsa v. Johnson, 193 Okla. 501, 145 P. 2d 198. Such charters are subject to change by amendment upon proper approval of the qualified electors of the municipality as contemplated by article 18, sec. 3, supra.

In 1920 the charter of the city of Tulsa was changed by an amendment known as article 12 of the charter. This amendment, which remained in force until 1926, operated to create a "water commission" as a body or board separate and distinct from the board of commissioners of the city and vested the commission with:

". . . full, complete and exclusive rights, powers, and duties in the doing and performing of all and every of the things to be done and performed in the construction, operation and maintenance of the water system or systems of the City of Tulsa. . ."

And specifically authorized the water commission:

". . . to appoint and employ superintendents, managers, engineers, a secretary, and such other employees as may be required in the discharge of their rights, powers, and duties as herein defined, and necessary and incident thereto, and may fix their compensation, time and manner of payment and make provisions therefor."

The effect of this charter amendment was to vest in the water commission of the city of Tulsa the exclusive power to act for and obligate the city in all matters connected with the expansion, management and control of the water department, subject, however, to the same limitations imposed by our Constitution and general law that would prevail if the power and authority were being exercised by any other authorized board or commission, as for instance the board of commissioners.

In other words, the charter provision was calculated to transfer authority to act for the city but not to enlarge such authority beyond governing limitations.

No authority is called to our attention indicating that the vesting of authority to manage and control a municipally owned and operated water system in a separate board or commission is beyond the limits of a local governmental matter subject to regulation by charter. Notice, in this connection, State v. Callahan, 96 Okla. 276, 221 P. 718; Pitts v. Allen, 138 Okla. 295, 281 P. 126; Blythe v. City of Tulsa, 172 Okla. 586, 46 P. 2d 310; Lackey v. State, 29 Okla. 255, 116 P. 913.

Upon consideration of the foregoing authorities we conclude and hold that the vesting of the exclusive authority to manage and control the water department of the city of Tulsa in a separate commission known as a water commission was a matter of purely municipal concern on which the charter provisions were of controlling importance. We further conclude that under the charter provisions above mentioned the action of the water commission in making the agreement with the plaintiff in 1922 had the same force and effect in obligating the city as the agreement would have had if it had been made by the board of commissioners

during a period when the same power was exercised by the last-named body.

It is next contended by the city that the indebtedness herein reduced to judgment was incurred and created in violation of section 26, of art. 10, of the Constitution. In asserting that a violation of the limitation on indebtedness is involved in this case the city emphasizes the seven years next preceding the filing of the claim, that is, the period of time from 1932 to 1939. The basis of this special emphasis will be apparent when we consider the facts pertinent to the financial situation of the city.

In 1922, when the agreement between the city and the plaintiff was made, the operating expenses of the water department of the city of Tulsa were being paid from its cash receipts. The water department was thus entirely disconnected from the general fund budget of the city. (At that time the connection of the water department with ad valorem taxation was entirely through the sinking fund by reason of the levies made to retire bonded indebtedness incurred for water works purposes.)

This method of operation was continued until the close of the fiscal year on June 30, 1931, when this method of fiscal management was changed and the department has since that time paid its operating expenses from appropriations made as a part of the general fund budget of the city of Tulsa. Either of these methods of fiscal management of a water department is permissible under our law. In re Bliss, 142 Okla. 1, 285 P. 73.

The water commission was abolished by charter amendment in 1926 which returned the authority to control and operate the water department to the board of commissioners of the city. This change did not interrupt the method of fiscal management of the water department.

At the close of the fiscal year of 1921-1922 the water department had to its credit a cash balance of $21,264.85,

against which there were outstanding unpaid warrants in the sum of $14,756,-44. Deducting the warrant indebtedness from the cash on hand, the balance at the close of the fiscal year was $6,508.41. In this litigation we are not concerned with whether this should have been treated as a free cash surplus and credited to the general fund on July 1, 1922. In re Bliss, supra. It was not so credited but was carried forward into the next succeeding fiscal year as a cash asset of the water department although it was not identified as a fund available for the payment of the accruing indebtedness in favor of plaintiff or any other possible claimant. Thereafter this cash balance was carried forward from year to year as a part of a greater cash balance until 1931, when the water department ceased to operate on the basis of paying operating expenses from cash receipts. It was then a part of a greater cash balance of $43,760.25. On June 30, 1931, this balance was transferred to the general fund. Thus the $6,508.41 item, traceable through the years from 1922, was exhausted at the close of the fiscal year of 1930-31.

Let us next consider the financial condition of the affairs of the city water department connected with bond issues. In February of 1922 the $6,800,000 bond issue previously mentioned was approved by the qualified voters of the city of Tulsa. In May of 1922, when plaintiff's agreement with the city was made, most of the fund thus provided for waterworks expansion remained unspent, in fact, only a million dollars worth of the bonds had been sold. (Most of the cash from that sale was then on hand and subject to expenditure by the water commission.) The bond remaining unsold were subject to subsequent sale for the purpose of providing funds for the expansion of the water system.

In 1924 and 1925 two additional bond issues for waterworks purposes were approved by the voters of Tulsa. The plaintiff does not rely upon these subsequent bond issues as constituting the

financial basis of its contractual arrangement with the city. We shall therefore not consider the question of whether funds derived from them could be so used. (Notice, Cobb v. City of Norman, 179 Okla. 126, 64 P. 2d 901.)

In April of 1929 the funds derived from the sale of bonds had been spent in payment of claims and indebtedness other than that of the plaintiff with the exception of small balances which were then transferred to the sinking fund account. These balances so transfered were: 1922 bond issue, $121.36; 1924 bond issue, $418.90; 1925 bond issue, $601.01.

Thus, in April of 1929, the funds created by the sale were exhausted, and on June 30, 1931, the fund derived from the operation of the water department in 1922, as well as other funds accumulated from cash receipts of the water department in subsequent years, were transferred and spent and thus exhausted.

Subsequent to June 30, 1931, the funds available for expenditure in connection with the water department were represented by appropriations made as a part of the general fund budget.

It is not contended by the plaintiff that any appropriations were made during any of the succeeding fiscal years from which the asserted indebtedness accrued and accruing under the agreement of May, 1922, could be paid except that portion thereof which was paid during those years by the relatively small payments actually made; namely, $250 in 1932; $200 in 1934; $200 in 1935; and $250 in 1937, which sums were paid out of appropriations for litigation expense in connection with the legal department's budget. In other words, it is not contended that there was any appropriation during any of the years 1931-1932 to 1938-1939, inclusive, available for the payment of the asserted balance of indebtedness in the sum of $14,100, which has been reduced to judgment by the trial court.

Bearing in mind the financial condition and method of management of the water department of the city of Tulsa, let us return to the constitutional limitations on indebtedness invoked by the defendant city. On this point, since we are dealing with a claim of indebtedness connected with a municipally owned water department, a public utility, we must consider both sections 26 and 27 of article 10 of our State Constitution. Section 26 provides in part that "no . . . city . . . shall be allowed to become indebted . . . to an amount exceeding, in any year, the income and revenue provided for such year," without the assent of three-fifths of the voters, and further limits the indebtedness which may be incurred with such assent to "five per centum of the value of the taxable property therein".

The limitation created by section 26 is subject to an express exception created by section 27, which allows cities "to become indebted in a larger amount than specified in section 26 for the purpose of purchasing or constructing public utilities, or for repairing the same" when the incurring of such indebtedness is authorized by a majority of the "qualified property tax-paying voters".

The purpose of the limitation contained in section 26, supra, is to place municipalities and other governmental subdivisions of the state on an annual "pay as you go" or cash basis except in so far as indebtedness to be paid in future years may be authorized by popular vote under the exceptions contained in section 26, or the exception provided for by section 27, supra. Board of Commissioners of Tulsa County v. Summers, 181 Okla. 312, 73 P. 2d 409; O'Neil Engineering Co. v. Town of Ryan, 32 Okla. 738, 124 P. 19; Herd Equipment Co. v. Town of Eagle, 180 Okla. 172, 68 P. 2d 420; Board of Education of Town of Terral v. Challey, 153 Okla. 273, 5 P. 2d 747; Faught v. City of Sapulpa, 145 Okla. 164, 292 P. 15; Town of Red Fork v. Gantt Bakery Co., 130 Okla. 175, 266 P. 444; Gentis v. Hunt, 121 Okla. 71, 247 P. 358; consider, also, State ex rel. City of Shaw-

nee v. Williamson, Atty. Gen., 186 Okla. 278, 97 P. 2d 74.

The constitutional limitation on indebtedness established by section 26, supra, applies to transactions connected with a municipally owned and operated water plant or other public utility when the method of operation is such that the funds derived from its operation are directly or indirectly connected with taxation (except perhaps when the transaction involved is clearly severable and is also self-liquidating). On the last-mentioned possible qualification we need express no opinion in this case, since the point is not involved herein. (Notice, Fairbanks, Morse Co. v. City of Wagoner, 81 F. 2d 209.) See Zachary v. City of Wagoner, 146 Okla. 268, 292 P. 345; Layne-Western Co. v. City of Depew, 177 Okla. 338, 59 P. 2d 269; Baker v. Carter, 165 Okla. 116, 25 P. 2d 747; notice, specifically, our discussion in Boswell v. State, 181 Okla. 435, 74 P. 2d 940, and Garrett v. Swanton, 216 Cal. 220, 13 P. 2d 725, cited with approval in Boswell v. State, supra.

In the case at bar the water department of the city of Tulsa has at all times since 1922 been connected with and partially supported by taxation. The $25,000, the $6,800,000, and the subsequent bond issues of 1924 and 1925 constituted general obligations of the city, payable by ad valorem taxes on property to satisfy sinking fund levies.

As was said by the Federal Circuit Court of Appeals, Tenth Circuit, on deciding a case which arose in this state, Iron Products Investment Co. v. City of Picher, 83 F. 2d 443:

"Plaintiff's theory is that the debt created by the contract is valid for the reason that the city, acting in a proprietary capacity as the owner of its waterworks, is not limited in its expenditures for waterworks repairs or replacements by any debt limitation. It also relies on the Special Fund Doctrine.

"We cannot subscribe to that theory. The waterworks was acquired by the city by means of capital raised by the sale of bonds. . . ."

And also observed:

"Furthermore, the waterworks system was acquired through general obligation bonds which are a direct burden upon the taxpayers of the City. See Perrine v. Bonaparte, 140 Okla. 165, 282 P. 332, 334. Debts created in excess of the annual income and revenue of the city, although payable solely from revenue of the waterworks, would cast an incidental burden on the taxpayers of the city and would be within the limitation of section 26, supra. Fairbanks, Morse & Co. v. City of Wagoner (C.C.A. 10) 81 F. 2d 209, 219; City of Campbell v. Arkansas-Missouri P. Co. (C.C.A. 8) 55 F. 2d 560, 563. See, also, In re Bliss, supra."

Thus the constitutional limitation must be applied in the case at bar.

Planitiff points out that its services were of such a nature that they could have been paid from the proceeds of the bond issue of 1922 or from income and revenue of water department received during that year. It then urges that the financial condition of the city in 1922 is of governing importance in determining whether it could recover in 1939 for services rendered on a quantum meruit basis throughout the years.

With reference to the financial condition of the city at that time (1922), it is said in the brief of plaintiff:

"Thus, we have $6,800,000, $1,000,000 of which had been cashed and was in the hands of the water commission and more than $6,000 in the cash turn-over in the hands of the commission at the time the Langley contract was made. Surely it was sufficiently financed to make it a legal contract."

This position is tenable as to the value of any and all services which were performed before the funds mentioned became exhausted, or depleted to an extent that no revenues remained to pay for additional services. However, in view of the failure of the agreement of 1922 to create a debt for a definite amount and the failure to subsequently create such a debt as—

certainable in amount before the exhaustion of the fund, the plaintiff cannot enforce payment by judgment for the value of services rendered when money to pay for the same had ceased to be available.

As we have previously stated, the funds derived from bond issues were exhausted in 1929. The $6,508.41 cash surplus, carried forward from 1922 in connection with the operating of the water department, disappeared in 1931. Thereafter the increasing debt asserted by plaintiff due to the continued performance of services was (with the exception of the money represented by the four small payments heretofore mentioned) without financial basis and cannot be approved. Our conclusion on this phase of the case rests upon the following considerations and authorities.

It has been repeatedly held by this court that when a debt of a municipality or other governmental subdivision of the state is within constitutional limitations at the time of its creation, the fact that funds available or revenues provided for its payment are subsequently exhausted by the municipal authorities does not prevent the collection of the debt by the creditor in an appropriate action for that purpose. This view of the law is sound and prevails in this jurisdiction subject to some exceptions created by the provisions of 62 O.S. 1941 §§ 311-316 (enacted in 1931, S.L. 1931, p. 110), which are not here invoked.

It should be noticed that the prohibition of the Constitution is against municipalities becoming indebted in any year in excess of the income and revenue provided for that year, except to the extent authorized by popular vote under section 26 or 27, supra.

Voluntary indebtedness created by contract comes within this prohibition, and generally speaking a debt is created when a contract or agreement is made (Faught v. City of Sapulpa, supra); but this is not always true. Sometimes the terms of the agreement are such

that a municipality does not become indebted until the happening of some contingency, as, for instance, the delivery of material or the performance of service, although in a sense an essential prerequisite of such indebtedness lies in the agreement under which the services are performed or material furnished. The point was well stated by the Supreme Court of the United States in City of Walla Walla v. Walla Walla Water Co., 172 U.S. 1, 43 L.Ed. 341, in discussing a limitation upon municipal indebtedness imposed by a city charter provision:

". . . There is a distinction between a debt and a contract for a future indebtedness to be incurred, provided the contracting party perform the agreement out of which the debt may arise. There is also a distinction between the latter case and one where an absolute debt is created at once, as, by the issue of railway bonds or for the erection of a public improvement,—though such debt be payable in the future by installments. *In the one case the indebtedness is not created until the consideration has been furnished;* in the other the debt is created at once, the time of payment being only postponed." (Emphasis ours.)

In recognition of the principle that time of creation of the debt rather than the time of the agreement may constitute a controlling factor in determining the constitutional limitation of indebtedness, this court said in Anadarko Funeral Home v. Scarth, 173 Okla. 103, 46 P. 2d 539:

"Obviously, in such cases, from the viewpoint of compliance with the Constitution (assuming that the expenditure contemplated in the contract is within the appropriation), the question is whether the contract obligation becomes a 'debt' before the funds are exhausted."

And in paragraph 2 of the syllabus we said:

"Where it is sought to bind a municipality on its contract for future services of claimant within the fiscal year the money to be spent by said municipality under the contract must not be in

excess of the appropriation for that purpose, for that year, or in excess of the part remaining in said fund at the time the contract is executed. If the contract does not prescribe a definite and certain total sum to become payable, but prescribes payment on a quantum basis, only that quantum of the services may be paid for as were performed up to the time that the fund became legally and validly exhausted, and not thereafter."

In Public Service Co. of Oklahoma v. City of Tulsa, 174 Okla. 58, 50 P. 2d 166, we reiterated as syllabus 1 our holding in the Anadarko Case, supra. See, also, Mayer v. J .T. Jones & Sons, 113 Okla. 119, 239 P. 904; and Rogers v. Oklahoma City, 45 Okla. 269, 145 P. 357. But consider and compare Flood v. Town of Shidler, 127 Okla. 148, 260 P. 52; Haskins & Sells v. Oklahoma City, 36 Okla. 57, 126 P. 204, and Cobb v. City of Norman, supra.

Perhaps these latter cases cited herein for comparison should be regarded in the light of our declaration that our constitutional provisions on limitation of indebtedness also prohibit the pledge of revenues and income which have not yet been provided for or collected. Some of the cases mentioned have been declared to rest on this doctrine. In Protest of Missouri-Kansas-Texas R. Co., 181 Okla. 229, 73 P. 2d 173, we said:

"The contention that the constitutional limitation is not infringed because the particular portion of the debt to be levied for during the one year may not exceed the income and revenue provided is not tenable. We do not understand counsel to assert that the independent district is liable for only one year's requirement for the obligations and no further; it can be liable for one year only because it has become liable for the whole which extends into succeeding years. In such case the fact that in any one year the income and revenue provided might be sufficient affords no relief, for the Constitution aims as well against pledging future revenues, and does not permit the assumption in one year of obligations to be paid out of succeeding years' rev-

enue even if such might otherwise be sufficient, unless the people vote thereon as required by the Constitution. See O'Neil Engineering Co. v. Town of Ryan, 32 Okla. 738, 124 P. 19; Flood v. Town of Shidler, 127 Okla. 148, 260 P. 52; Cobb v. City of Norman, 179 Okla. 126, 64 P. 2d 901, and cases cited therein."

Upon consideration of Anadarko Funeral Home v. Scarth, supra, and other authorities herein reviewed, we conclude that plaintiff was entitled to recover for the reasonable value of services rendered prior to the exhaustion of the fund created by the $6,800,-000 bond issue and the fund preserved and carried through subsequent years from water receipts of 1921-22, or the depletion of such funds to an extent that further services could not be paid for.

Plaintiff is of the opinion that this conclusion conflicts with our holding in Town of Covington v. Antrim Lumber Co., 123 Okla. 129, 252 P. 50, and City of Healdton v. Blackburn, 169 Okla. 357, 37 P. 2d 311. Both of those cases involve contracts made prior to the exhaustion of available funds derived from bond issues and in both recovery on the indebtedness found to have been created was permitted after the expenditure of the funds for other purposes. To that extent they lend support to plaintiff's position. However, neither of the cases discussed the precise question of whether the amount of indebtedness, if any, accruing after the exhaustion of the fund should be paid, a question subsequently treated by this court in Anadarko Funeral Home v. Scarth, supra.

In both of the cases relied upon by plaintiff on this point (Town of Covington v. Antrim Lbr. Co. and City of Healdton v. Blackburn, supra) the rule therein announced as applicable to funds derived from the sale of bonds was shown to rest in whole or in part on cases dealing with the disposition of general funds. Thus, while our subsequent decision in Anadarko Funeral

Home v. Scarth, supra, related particularly to general funds, it treated the refinements of the rule which was treated as equally applicable to funds derived from bond issues in the Town of Covington and City of Healdton Cases, supra.

Our conclusion as announced, supra, necessitates that this cause be reconsidered in the trial court, since the judgment of that court includes remuneration for services performed after, as well as before, the exhaustion of the funds and revenues. The testimony in the record does not enable us to separate the portion of the recovery which may be approved from that which cannot.

At one place in the record Mr. Langley testified that the services rendered before the exhaustion of the funds was worth $15,000 and those rendered afterwards, $10,000. However, we cannot hold that the trial court's judgment was based upon this particular testimony as distinguished from the testimony as a whole upon the point involved.

The cause is reversed and remanded, with directions to the trial court to proceed in accordance with the views herein expressed.

HURST, V.C.J., and RILEY, OSBORN, BAYLESS, and ARNOLD, JJ., concur. GIBSON, C.J., and WELCH and CORN, JJ., dissent.