SELECTED INVESTMENTS CORPORA-
TION, a Corporation, Plaintiff
in Error,

v.

The CITY OF LAWTON, Oklahoma, a Mu-
nicipal Corporation, Defendant in
Error.

No. 36442.

Supreme Court of Oklahoma.

Nov. 20, 1956.

Rehearing Denied Dec. 18, 1956.

968

John Barry, LaJolla, Cal., John W. Tyree, Lawton, Fletcher Riley, William F. Collins, Jr., and Arthur Leach, Oklahoma City, for plaintiff in error.

Logan, Godlove & Cummins, Lawton, for defendant in error.

Felix, Douglass & Griffin, Sylvanus G. Felix, and John T. Spradling, Oklahoma City, on the brief, amicus curiae.

BLACKBIRD, Justice.

As the parties to this appeal appear in the same order in which they appeared in the trial court, they will herein be referred to by their trial court designations.

By the action there instituted, plaintiff corporation sought to replevin pipes and other equipment comprising the water distribution systems, it, and its subsidiary and predecessor in interest, Home Building & Supply Company, hereinafter referred to by the abbreviation: "H. B. S.", caused to be installed in, and to serve with city water, two residential areas which originally were unimproved vacant land, but later became the Lee and Selected Investments Center Additions of defendant city.

In two separate alleged causes of action, plaintiff, in its amended petition, alleged, among other things, its ownership, and right to immediate possession, of these water distribution systems, and that, notwithstanding a demand plaintiff had made upon said defendant City on a certain date in December, 1952, that it return them, said City had, ever since said date, unlawfully held, controlled, and refused to return them to plaintiff. For relief, plaintiff prayed the court to enter judgment against the City requiring it to return the systems, or, if this could not be done, to pay plaintiff their actual value, which, in the instance of the Lee Addition system (involved in plaintiff's first cause of action) was alleged to be the sum of $15,640.08, and, in the instance of the Selected Investments Center system (involved in its second cause of action) was alleged to be $28,026.02.

In returning the writ of replevin issued in said cause, the Sheriff reported that as the property involved was buried underground, he could not take physical possession of it. Accordingly, at the trial plaintiff introduced uncontradicted evidence of the reasonable value of the pipe and equipment, as installed, on the theory that the component parts of neither distribution system could be physically returned to it.

Due to disagreement in the parties' appellate argument concerning the significance that should be given various facts pertaining to what may be referred to as the "equities" of plaintiff's position, and to afford a better understanding of the parties' respective positions, we think it worth while to set forth a rather detailed statement of the background facts leading up to the filing of this action, despite the fact that, in reaching our conclusions, the facts considered will be only those pertinent to the issues of replevin, which, of course, is a purely legal, as distinguished from an equitable, action. This will accord with the trial court's ruling, toward the end of the trial, that plaintiff's pleadings be deemed amended to conform to the proof *only to the extent relevant to the issues of a replevin action*.

In the Spring of 1947, plaintiff owned all of the area now known as the Lee Addition; and defendant City was in the throes of a rapid post-war population increase, which posed expansion problems. As plaintiff desired development of the area as a city residential section, its manager, Mr. F. A. Lee, before the area was platted as a city addition, conferred with defendant's Mayor and City Engineer concerning such a project and was told that the City did not have sufficient funds on hand to extend its water lines into the area, but said officials promised that if plaintiff company would go ahead and install the necessary mains and equipment to distribute water to the area, such system could be connected with the City system, and the City would there-

after reimburse plaintiff its costs of constructing the system at the rate of $1 per month for each home or consumer unit that "tapped" the system to purchase water from the City. Apparently, a part of the plan and agreement was for the new area's distribution system to be built according to specifications approved by the City Engineer, and for the area, when it had been platted and the system completed, to be annexed by the City as an addition thereto. Accordingly, on March 11, 1947, plaintiff filed in the County Clerk's office its "Owners Certificate and Dedication" along with a plat of the area referring to it as the "Lee Addition." In said Certificate and Dedication, it was specifically recited that there was dedicated to the "public use all * * * streets, drives, avenues, alleys and thoroughfares as shown on" the plat "free and clear of all encumbrances whatsoever." According to Mr. Lee, there was a period during which complete agreement between his company and the City was stalemated due to plaintiff's reluctance to set aside, or dedicate, a part of the area as a city park, which was desired by the City Park Board. However, subsequently, plaintiff advised the City Council, by letter read in its meeting of May 13, 1947, that it had dedicated 10 lots in a certain block for that purpose. The letter also stated that the Lee Addition's coming into the City would have to be delayed until the existing contracts plaintiff had entered into for the installation of the water lines had been completed, at which time the exact cost thereof would be submitted to the City, so that plaintiff could be reimbursed therefor. Later, when the Addition's water distribution network was completed to the satisfaction of the City Engineer (who designated how far from the streets and property lines in the parkings the mains should be placed) and of the Fire Chief (who designated where fire hydrants should be installed) plaintiff wrote the Mayor and City Council, under date of August 15, 1947, inclosing a statement of the cost of said system as "16,188.84", and indicating plaintiff's desire that the "Addition" be brought into the City at a specified early date. Thereafter, at one of its meetings during the month, specifically on September 16, 1947, there was presented to the City Council a new statement of the cost of the system totalling only $15,618.31, wherein the fee of the firm of consulting engineers, who had had over-all supervision of it, was scaled down to less than one-half of its original figure, and other deductions were made for the cost of certain fire hydrants. In connection therewith, there was also presented for the council's consideration and action, a draft of a proposed written contract entitled: "Lease Agreement", which had the dual purpose of allowing defendant City to lease, and/or to purchase, the water distribution system from plaintiff. The rental provided to be paid for the term of the lease, which was from July 1, 1950, to July 1, 1960, was to be paid plaintiff by defendant from the money the latter received from the sale of city water to users, whose residences were connected with the system, at the rate of $1 per month for each such residence or residential or user unit. According to one paragraph of the contract, the City had to exercise its option to purchase the system from defendant for $15,618.31, less deductions from said price of any amounts theretofore received by plaintiff from defendant under the terms of the lease, "on or before the 1st day of July, 1950." (There is some contention that this paragraph is in conflict with a paragraph immediately preceding it allowing defendant until January 1, 1960, to exercise its option; and that consequently the lease was ambiguous. But, since the suit involved herein is a replevin action, rather than an action on the contract, or to reform it, such asserted ambiguity may be disregarded). At the aforementioned meeting, the City Council passed a resolution authorizing the Mayor to execute the lease on behalf of the City, and, according to the minutes of the meeting, the following additional proceedings occurred:

"Cameron (apparently a Council member) asked unanimous consent that

the City of Lawton will make their first payment on the water line in the Lee Addition on June 30, 1950, which will cover January 1, 1950, through June 30, 1950, making a period of six months, then thereafter yearly payments will be made. The payment will be $1.00 per month for each house that is occupied.

"No Objections. It is so ordered."

On the same day, there was enacted the defendant City's Ordinance No. 906 annexing the Lee Addition to said City. The Ordinance made no reference to the aforedescribed "Lease Agreement" executed the same date and, apparently, as a part of the same transaction. In said agreement, plaintiff's ownership of said Addition's water distribution system was specifically recognized, and it was declared that the City could "make use" of it in selling water.

Thereafter, plaintiff, either directly or through one or both of its subsidiaries, H. B. S., or the Carroll Company, completed home building projects it had started in the Lee Addition before its annexation; and, at the time of the trial, 152 homes had been built and sold to individual citizens and taxpayers of defendant City. Before these homes could be approved for F. H. A., loans, it was necessary for plaintiff to get a commitment from the defendant City that it would maintain the water mains in the Addition; and, it seems to be conceded that none of the homes would have been approved for such loans had they not been connected with such a utility. As to the homes that were built therein before the Addition's annexation to the City, plaintiff, or the builder, saw to connecting them with the Addition's water mains and thereafter paid the City for the amount of water used at them until they were completed and/or sold. As to homes that were constructed after the annexation, the city's water department took care of connecting them with the mains. Ever since their sale, the individual purchasers of all the homes have paid the City for the water there used at the same rate paid by other users of water in the defendant City. From its water revenue, which during each year has been kept in a utility account separate from its other revenue (and at the end of each year the balance remaining in said account, after paying the expenses of operating the system for that year, is transferred to its general revenue account) defendant City, on July 1, 1950, made payments totalling $2,142 on the cost of the Lee Addition's water system ($15,618.31) as specified in the aforedescribed "Lease Agreement", leaving a balance remaining of $13,476.31 unpaid.

The development and improvement of plaintiff's Selected Investments Center Addition, hereinafter referred to merely as the S. I. C. Addition, has followed essentially the same pattern as that of the Lee Addition, except that the agreement between plaintiff and defendant for the latter's use of the distribution system plaintiff installed therein to supply its residents with city water, was never reduced to a writing such as the aforedescribed "Lease Agreement." However, there can be no doubt but that plaintiff's installation of such system in this addition was prompted, in part at least, by representations or promises of City officials that when said installation was completed according to the City Engineer's specifications, the area would be annexed as another addition to the City, and, through it, the City would sell resident-users therein city water under terms and conditions identical, in all material respects, with those under which it was supplying residents of the Lee Addition. The S. I. C. project was not commenced or completed until several years after the Lee Addition was annexed, however; and, it appears that not long after the S. I. C. Addition's annexation was prescribed by City Ordinance enacted May 21, 1952, there existed a growing feeling in some City circles that developers of such additions were being sufficiently reimbursed for the installation costs of such systems, by profits from sales of homes therein, and that if, in addition to this return on their investments, the City also compensated such developers for them,

then companies like plaintiff were, in actuality being paid twice for them. At least one of the City Councilmen was shown to have entertained this view. Then too, a Federal agency referred to as the House and Home Finance Agency made it known that it would not pay, or advance money, for laying additional lines to other local areas, if the City continued to reimburse developers for such improvements. It was apparently because of these factors and the conceivable fact that the City was finding it had committed itself to disbursing more than some city officials desired of its revenue for such reimbursement of developers of various new city additions, that defendant never paid plaintiff anything on the cost of the S. I. C. water system, and, after the aforesaid July 1st, 1950 payment, made no further payment on the Lee Addition system, despite the fact that it was still using these systems to increase its sales of city water. By December 9, 1952, plaintiff had decided to demand that the City either finish paying the cost of these systems or turn them back to it, as their owner. Accordingly, its attorneys, at a City Council meeting held that date, made such a demand. Said demand was refused by the Council's passage of a motion to deny plaintiff's claim of $26,700.98 for the cost of the S. I. C. System, "and all other claims of like manner, where there is no contract." Within a week thereafter, the present action was instituted.

After establishment of the foregoing facts, and others unnecessary, at this point, to mention, the trial court took the case under advisement and directed the attorneys for both parties to submit briefs. Subsequently, and upon consideration of the various arguments and authorities which had come to his attention, the trial court rendered judgment for defendant based upon extensive written findings of fact and conclusions of law. One of the two principal bases of said judgment was the court's conclusion that:

> " * * * Cities are not required to pay for pipes that were laid in an area before the addition is annexed to the City because it is presumed that the cost of the pipes were figured into the increased value of the lots and charged to the purchasers of lots; and because the use of the pipes is dedicated to the area and the people who buy property therein do so anticipating the use of the pipes."

The other principal reason for the trial judge's decision seems to have been his opinion that a contract such as the aforedescribed written one concerning the Lee Addition, was unenforcible as being in violation of the provisions of our Constitution prescribing debt limitations for municipalities. Const. art. 10, §§ 26, 27. (See generally 38 Am.Jur., "Municipal Corporations", sec. 471). In the present appeal, plaintiff asserts that both conclusions are erroneous and are inapplicable to this replevin action, in which the issues are simply and fundamentally as follows:

(1). Does plaintiff own, or have the right to immediate possession of, the water distribution systems involved?

(2). Is defendant wrongfully withholding possession of them from plaintiff?

The trial court's first aforementioned conclusion was apparently based upon the cases of City of Richmond v. Henrico Co., 185 Va. 176, 37 S.E.2d 873, and other cases reviewed in Spaugh v. City of Winston-Salem, 234 N.C. 708, 68 S.E.2d 838, which follow City of Danville v. Forest Hills Development Corp., 165 Va. 425, 182 S.E. 548. The last cited case (according to the reporter's headnote) held:

> "Real estate corporations constructing water, gas, and sewer mains, fire hydrants, and lighting equipment as inducement to purchase of lots [,] dedicated such mains, hydrants, and lighting equipment to use of lot owners and had no right to claim adverse ownership in or remove such mains, hydrants, or lighting equipment without lot owners' consent."

We do not consider the opinions in the Danville case and the case of Suburban Real Estate Co. v. Incorporated Village of

Silverton, 31 Ohio App. 452, 167 N.E. 474, relied upon therein, as controlling in this case. We do not think what was there said concerning the title and the right of the respective plaintiffs therein to bring such actions, is applicable here, where—as was not the case there—the plaintiff was not shown to have undertaken the installation of the utility system solely for the purpose of enhancing the value of its lots, or the homes constructed therein. Here, as there, if plaintiff had undertaken the utility projects involved in circumstances under which plaintiff (to use the language of the Danville case) "did not, and could not" have expected reimbursement from the defendant City, it may well be that said corporation should not have prevailed. But we find no reason, nor substantial basis in the law generally, or our statutes, for divesting plaintiff of its property and ownership rights in the water systems involved on the fabricated or fictional ground of a presumption that the cost thereof was figured proportionately into the increased value thereby given each of the lots or residences plaintiff sold in the Additions and that such cost was thereby passed on to be sooner or later paid by the purchasers of said properties. Here, there was no evidence, as in Trentman v. City and County of Denver, Colorado, D.C.Colo., 129 F.Supp. 624, Country Club District Service Co. v. Village of Edina, 214 Minn. 26, 8 N.W.2d 321, and the Suburban Real Estate Co. case, supra, that any representations or inducements were made to such purchasers, such as that they would be assessed no part of the cost of the water system, or that same were already paid for, or that the city owned them. Here the undisputed evidence shows that under its agreements with the city, plaintiff both expected, and had every right to expect, that its ownership of the water distribution systems would remain inviolate and that, if defendant ever assumed their ownership for itself, it would voluntarily pay for them or, under our laws governing and protecting ownership and property rights, it would relinquish them, or pay their value. As pointed out by the Federal Court in the case of Wichita Finance & Thrift Co. v. City of Lawton, D.C., 131 F.Supp. 788, identical with the present case in most material respects, a municipality cannot take private property, even for public use, without compensating its owner, Okl.Const., art. II, sec. 24, forbids it; and, in the operation of a business such as selling water to its residents, a city has the same rights and liabilities, including liability for conversion of personal property (if authorized and ratified by it), as a private corporation. In addition to the cases cited in the Federal Court opinion, 131 F.Supp. on page 790, see Leonard v. Town of Waynesboro, 169 Va. 376, 193 S.E. 503, and 56 Am.Jur., "Water Works", sec. 35, together with cases cited under footnote 15. Defendant argues that the cited provision of our Constitution pertains to condemnation proceedings and has no application to a replevin action like the present one. We do not agree. While it is obvious that other provisions of said section do prescribe a method by which compensation may be obtained by the owner thereof for private property taken for public use, we think the first sentence of the section announces a principle of law prohibiting unlawful taking of private property, which was a part of the basic law of this country long before our State's Constitution was written; and it applies to all cases involving such a taking.

Defendant consumes one entire brief in criticizing the above-cited opinion in the Wichita Finance & Thrift Co., case. Its counsel point out that some of the statements therein contained are not supported by the authorities cited for them, but said counsel fails to demonstrate any error in said opinion on the two principal replevin issues hereinbefore referred to. As to the first of these, which deals with plaintiff's ownership, and right to immediate possession of the property, the Federal judge therein points out that dedications made under the last portion of our Statute, Tit. 11 O.S.1941 and 1951, sec. 515, as were the ones there and here involved, do not ordinarily convey title to water lines already

laid under the lands so dedicated. This is made clear in Langston City v. Gustin, 191 Okl. 93, 127 P.2d 197. Here, the plats of the Lee and S. I. C. Additions that were attached to the dedication declarations for each of said Additions are not in evidence, but both of the latter instruments contained the identical language hereinbefore quoted from the one pertaining to the Lee Addition, which said language, under our statute, as shown in the cited case, conveyed the city no more than an easement with the fee simple title remaining in the dedicator corporation, or plaintiff herein. This language, plus all of the evidence of circumstances surrounding the dedications, and the city's continued recognition (going so far in the instance of the Lee Addition as to include specific wording to that effect in the "Lease Agreement") of plaintiff's ownership, shows beyond doubt that it was never intended by the parties that, by these dedications, fee simple title to the streets and/or parkings under which the water mains were laid, or to the mains themselves, should pass to the defendant. And, the fact that plaintiff has allowed defendant, and the public, to use them constituted no dedication, or conveyance of such title. Garvin County v. Lindsay Bridge Co., 32 Okl. 784, 124 P. 324; Oak Cliff Sewerage Co. v. Marsalis, 30 Tex.Civ.App. 42, 69 S.W. 176. That, in Oklahoma, a city ordinarily does not own the fee simple title to its streets was made clear as early as Coleman v. Frame, 26 Okl. 193, 109 P. 928, 31 L.R.A.,N.S., 556. See also 38 Am.Jur., "Municipal Corporations" and the cases cited under Note 18 thereto.

■ Besides arguing that title to the water mains passed to the city by reason of the dedications, its counsel also argue that said title passed to the individual purchasers of residences in the Additions; and, in support of this argument, they call attention to the purchase contracts plaintiff and H. B. S., entered into with said purchasers whereby said companies agreed to furnish said purchaser warranty deeds to said property together with all "appurtenances thereunto belonging * * *". As-

suming, without deciding, that the word "appurtenances", as there used, was sufficiently broad to include an interest in the water mains, as distinguished from the lines leading therefrom into such individual homes, their ownership by such third persons not parties to this action, and through whom defendant does not deraign its alleged title to the water distribution systems, could be no defense to it in this replevin action. See Jones v. McKenzie, Okl., 285 P.2d 438. The city does not claim to be appearing in this action for those home owners, nor to be entitled, because of any connection or relation with them, to remain in possession of the systems. As defendant City is not the owner of the streets and parkings traversed by the distribution systems, it is not necessary to deal with its contention that they became a part of the realty by being buried therein; however, in this connection, see Memphis Gaslight Co. v. State, 46 Tenn. 310, 98 Am. Dec. 452.

■ As to defendant's liability for asserting, without right, dominion over, and ownership of, the water distribution systems, the court, in the Wichita Finance & Thrift Co. case, held the city liable on the theory of tort. Defense counsel infer that a city is not liable for conversion. Our search has revealed few such cases (see the various divisions of the National Reporter system under "Municipal Corporations", opposite Key No. 738, "Conversion") but we think there can be no doubt that a municipality is liable for conversion in the situation presented here. See Town of West Universtiy Place v. Anderson, Tex. Civ.App., 60 S.W.2d 528; Bertone v. City & County of San Francisco, 111 Cal.App. 2d 600, 245 P.2d 29, 34; McQuillin, Municipal Corporations (3rd Ed.) Vol. 18, sec. 53.11, Note 92. In the early case of Methodist Episcopal Church South of Vicksburg v. Mayor and Aldermen of City of Vicksburg, 50 Miss. 601, it was held:

"The doctrine of implied municipal liability to all cases where money or property of a party is received under

such circumstances, that the general law, independent of express contract, imposes the obligation upon the city to do justice with respect to the same. If the city receives money or property which does not belong to her, it is her duty to restore it to the true owner, or if used by her, to render an equivalent to the true owner; from the like general obligation, the law, which always intends justice, implies a promise."

Essentially the same principle of justice was incorporated in the court's opinions and one headnote, of Busch-Sulzer Bros.—Diesel Engine Co. v. City of Walters, 10 Cir., 133 F.2d 65, and Fairbanks, Morse & Co. v. City of Wagoner, 10 Cir., 81 F.2d 209; and still stands. On the appeal of the Wichita Finance & Thrift Co. case, to the U. S. Circuit Court of Appeals, styled City of Lawton, Oklahoma v. Wichita Finance & Thrift Co., Inc., 10 Cir.,* the latter court, in an opinion filed therein on February 6, 1956, took the position that the city's premeditated and voluntary act of asserting ownership of the water distribution systems in that case without paying the owner, Wichita Finance & Thrift Company therefor, was not a real tort, quoting with approval from Keller v. City of Scranton, 200 Pa. 130, 49 A. 781, 782, as follows:

"* * * when * * * (the) 'tort' is done under a contract and the assumption of the consequent damages is an express term of such contract, we have a perfectly clear case outside of the principle that makes municipalities liable for their wrongful acts, without regard to their indebtedness, and, within the constitutional prohibition of a contractual obligation to pay in future for a consideration in the present."

The Circuit Court finally concluded by affirming the Federal District Court's judgment in favor of the Finance Company on the theory that, as there was no challenge of the lower court's finding that, at the time the "rental agreements" there involved were executed, there was sufficient money in the City's "Utility Fund * * * to pay

* See 240 F.2d 600.

the maximum amounts" said agreements provided the City should pay the owners of the water distribution systems, that said agreements, or contracts, were not invalid as in contravention of the municipal debt limitation provisions of our Constitution, under the doctrine referred to in City of Tulsa v. Langley, 196 Okl. 680, 168 P.2d 116, 123. See also Faught v. City of Sapulpa, 145 Okl. 164, 292 P. 15. In his dissenting opinion in Kelley v. Earle, 320 Pa., 449, 182 A. 501, 509, Justice Maxey said: "It is firmly established law that if current revenues are not overreached by an obligation incurred, that obligation is not a debt within the meaning of the constitutional prohibition * * *." This pronouncement was probably an effort by the Circuit Court to place that case outside of the operation of the broad and strong holding in Fairbanks-Morse Co. v. City of Geary, 59 Okl. 22, 157 P. 720, as follows:

"A debt which is in excess of the constitutional or statutory limit is void; and in *no form* can such debt be held valid upon any theory of quantum meruit, or equitable obligation. The absolute lack of power to contract such indebtedness bars *every form of action and every legal devise* by which recovery is sought; nor will the courts aid the vendor *to recover the property sold* and delivered under such illegal contract." (Emphasis ours.)

Here, although possession and control over the water systems were turned over to defendant under the agreements hereinbefore described, there was *no sale* of them, or passing of title from plaintiff, the owner thereof, to defendant city. The agreements merely gave defendant an option to purchase, that it never exercised. If the portions of said agreements pertaining to such option were severable from the remainder of said agreements, then perhaps recovery for the plaintiff in such cases might be upheld on the theory that since, at the time the city refused to make any further payments under said agreements (December, 1952), it had an unencumbered balance in its utility fund, or account, of thousands of

dollars more than enough to buy the systems at the total agreed price (as the undisputed evidence shows) assuming, of course (as is contended by plaintiff) that said agreement gave defendant until July 1, *1960* rather than *1950* to do so. In this connection, see Illinois Trust & Savings Bank v. City of Arkansas City, 8 Cir., 76 F. 271; City of Tulsa v. Langley, supra, as cited in the Circuit Court opinion; and 64 C.J.S., Municipal Corporations, § 1852a, Note 75. However, we think that to do so, would be bringing into a replevin action collateral matters which have no proper place therein as they would have in actions on contract, such as for specific performance or for damages for breaches thereof. Here, plaintiff, is not attempting to enforce a contract, nor asking court aid in such an endeavor. It is merely reclaiming property which is its own and whose title has never left it. The only relevancy which the terms of the "Lease Agreement" as to the Lee Addition, or of the partially executed oral agreement as to the S. I. C. Addition, have in the present case is to show how defendant acquired possession of the water distribution systems involved and to establish that, due to its breach of these agreements, plaintiff has the right to the immediate possession thereof. Plaintiff is not attempting to recover property *sold* as did the plaintiff in the Fairbanks-Morse Company case; nor is it attempting to recover "consequent damages" prescribed by "an express term" of any contract, as did the plaintiff in the Keller case, supra. Plaintiff's right to a money judgment is derived not from contract. Its right to a judgment in replevin comes from its ownership of the property, its right to immediate possession thereof, and defendant's refusal to relinquish such possession. If the water systems can be restored to plaintiff's possession, in as good condition as they were in when converted by defendant, there is no ground for awarding it a money judgment in this replevin action. 46 Am.Jur., "Replevin", sec. 8, Note 20. It was not established at the trial that such restoration could not be effected. In fact, from the remarks of one of de-

fendant's attorneys toward the end of the trial, it appears that he concurs with us on this point; and that he represented that the city would relinquish possession of the systems to plaintiff, if judgment went against the City. In accord with the foregoing, we can only conclude that the undisputed evidence in this case entitled plaintiff to judgment in replevin, and that the trial court erred in refusing it such a judgment.

■ Defendant makes the additional argument that the action is barred by either the 2-year statute of limitations applicable to conversion, or the 3-year statute applicable to implied contract. There is no merit in this contention. Plaintiff's cause of action did not accrue until the defendant City, upon repudiating its agreement with plaintiff, began asserting dominion over the water system, without right, and refusing to relinquish their possession to plaintiff within one week of the filing of this action. In this connection, see Brownell v. City of Petersburg, 5 Cir., 128 F.2d 721, 724.

The judgment of the trial court is reversed with directions to set same aside and enter an alternative judgment of replevin for plaintiff, directing defendant to relinquish possession and control of the mains and other equipment comprising the water distribution systems involved, or pay plaintiff the reasonable value of said systems on December 9, 1952, totalling $47,186.47, less $2,142, which, as hereinbefore shown, defendant has already paid plaintiff as rentals.

JOHNSON, C. J., WILLIAMS, V. C. J., and CORN and DAVISON, JJ., concur.

WELCH, J., concurs in result.

HALLEY, J., and EUBANKS, Special Justice, dissent.

HALLEY, Justice (dissenting).

I cannot concur in the majority opinion for several reasons. I think it is based upon an erroneous assumption that in a replevin action where plaintiff proves that it owns the property sought to be replevied

and that it is entitled to possession, it is entitled to judgment without regard to any other question.

The opinion almost entirely overlooks and ignores what appears to me to be the most important question involved, which is: did the written lease or conditional sales contract as to the water lines in Lees Addition create an indebtedness of the City of Lawton which is prohibited by Sections 26 and 27, art. X of our State Constitution, thereby rendering the agreement void and unenforcible by replevin or any other action?

It is also held that the "Lease Agreement," executed in 1947, is not a conditional sales contract. Considerable stress is laid upon the fact that the written agreement is headed or labeled a "Lease Agreement." It is fundamental that the character of a written agreement is determined by its terms, and not by what it is designated by the parties executing it.

To me, the agreement is more of a conditional sales contract than a lease. It contains elements of a lease that are very clear, and it also contains with equal clearness the basic essentials of a conditional sales contract. It is without doubt the intention of the parties, as expressed by its terms, that upon the payment by the City of Lawton to the plaintiff of a definitely named amount the water lines in Lee Addition would become the property of the City of Lawton. The source of that definite sum is wholly immaterial.

That part of the agreement clearly shows the intention of the plaintiff to lease the water lines to the City until the rentals provided for reached the agreed price to be paid for the lines, or until the agreed price to be paid was paid by the City in any other manner or from any other source, leaves no doubt but that the City of Lawton had the right to pay the balance due upon the agreed price at any time it chose to pay, regardless of the source from which such payment was made, and in the event of full payment, the water lines would become the property of the City. It was definitely agreed that when the rentals agreed to be paid by the City reached the agreed purchase price, then the water lines would automatically become the property of the City of Lawton. To me the written agreement is as certainly a conditional sales contract as it is a lease agreement.

In any event the agreement fixed a definite price which would be paid at any time in cash, or it could be paid over a term of years from the agreed rental of $1 per month for each residence taking water from the City, at the option of the City of Lawton. When this action was filed in 1952, it was admitted that $2,143 had been paid upon the agreed purchase price, leaving a balance on the water lines in Lee Addition of $13,476.31. The purported lease agreement gave the City until July 1, 1960, to pay "unless the full amount has been paid prior to that date."

The refusal of the City to continue payments appears to have arisen because a Federal Agency refused to approve loans upon the City residences unless the City refused to make further payments upon the cost of the water lines. When this action was filed it occurred that the agreement mentioned was a violation of the constitutional provisions above mentioned to the effect that the City had become indebted in an amount exceeding the income and revenue provided for such year without the consent of the voters of the City of Lawton.

Did the purported lease agreement create such indebtedness? It cannot be disputed that the indebtedness created was not provided for or to be paid out of the revenue available from the current year, but was to be paid out of revenue accruing from the sale of water by the City through the water lines involved.

This Court in News Dispatch Printing & Audit Co. v. Board of Com'rs of Adair County, 177 Okl. 162, 57 P.2d 1156, 1157, announced in the first and second paragraphs of the syllabus as follows:

"The intention and plain purpose of section 26, art. 10, of the State Constitution is to require municipalities to carry on their corporate operations up-

on the cash plan. The revenues of each year must take care of the expenditures of such year; and any liability sought to be incurred by contract, express or implied, executed or executory, in excess of such current revenue in hand, or legally levied, is void, unless it be authorized by a vote of the people, and within the limitations therein provided."

"Whoever deals with a municipality does so with notice of the limitations on it or its agents' powers. All are presumed to know the law, and those who contract with it, or furnish it supplies, do so with reference to the law; and if they go beyond the limitations imposed, they do so at their peril."

In the early case of Fairbanks-Morse Co. v. City of Geary, 59 Okl. 22, 157 P. 720, the City of Geary had purchased certain machinery at a definite price, paid partly at delivery and the balance in monthly installments over a period of years. When the City failed to make installment payments, the seller filed a replevin action. The contract was held to be void and the Court announced in the fourth paragraph of the syllabus as follows:

"A debt which is in excess of the constitutional or statutory limit is void; and in no form can such debt be held valid upon any theory of quantum meruit, or equitable obligation. The absolute lack of power to contract such indebtedness bars every form of action and every legal devise by which recovery is sought; nor will the courts aid the vendor to recover the property sold and delivered under such illegal contract."

In Zachary v. City of Wagoner, 146 Okl. 268, 292 P. 345, 346, the City had purchased electric machinery and agreed to pay therefor from the income from the plant. This Court held this agreement void as violative of our Constitution, and said in part:

"The provisions of sections 26 and 27, article 10, of the Constitution apply without regard to the source from which the funds pledged to the payment of the indebtedness incurred are to be obtained.

"The fact that an indebtedness incurred by a municipality is to be paid only from some source other than ad valorem taxation does not render inoperative the limitation contained in section 26, article 10, of the Constitution, or extend the grant of authority contained in section 27, article 10, of the Constitution. * * *

"Section 27, article 10, of the Constitution, prescribes the manner and means municipalities must follow and comply with to exercise the power granted them by section 6, article 18, of the Constitution, and such manner and means is exclusive."

This Court held to the same effect in City of McAlester v. State ex rel. Board of Public Affairs, 195 Okl. 1, 154 P.2d 579.

Much is said about the fact that the City of Lawton operates its water system in a proprietary capacity and at all times had sufficient cash in that fund to pay for the water lines of the plaintiff. In Layne-Western Co. v. City of Depew, 177 Okl. 338, 59 P.2d 269, the City purchased a water pump and agreed to pay therefor. It failed to pay and the seller sued for the purchase price. It was held that the fact that the City of Depew operated its water system in a proprietary capacity did not relieve it of the constitutional inhibitions in regard to creating an indebtedness beyond the revenues available for the current year without first obtaining the consent of the voters of the city.

The majority opinion appears to accept the assertion of the plaintiff that not one cent was charged for the water lines in the sale of any lot in Lee Addition. This is contrary to the finding of the trial judge who heard this case. This assertion is too unreasonable to justify argument. What was meant, I think, was that in the sale of residence lots no specific mention was made that the water lines were available for each lot. It is a matter of common knowledge

that residence lots in a modern city cannot be sold without water connections already installed, as here, or an agreement that they will be installed.

I find it unnecessary to discuss the above questions as applicable to the Selected Investments Corp. Addition which was not covered by the written agreement covering Lee Addition. The agreement relative to payment for the water lines appears to have been similar to that applicable to Lee Addition. It follows that I believe that agreement is also void for the same reasons that the agreement as to Lee Addition is void.

I note that while the plaintiff insists that it has at all times owned these water lines and that they are personal property, yet it appears that they have never rendered them for taxation. This is but another circumstance indicating that after the additions were annexed at their own request they considered that they had made a conditional sales contract with the City of Lawton.

When plaintiff filed this action it is bound to have known that the water lines were under the ground and could not be returned to it, as the return of the sheriff showed on the Writ of Replevin.

My attention has been called to the decision of the Federal Court of the Tenth Circuit, where a case similar to the one here involved was decided by that court adverse to the view held by me. This Court is not bound by that decision construing the laws of this State, and with due respect for that court, I cannot concur in that decision.

In my opinion the ruling of the majority opinion will have the effect of permitting cities to virtually nullify the constitutional inhibitions mentioned. They can operate their public utilities in a proprietary capacity and contract any amount of indebtedness they desire without the vote of the taxpayers by entering into a lease agreement for the City to pay a definite amount for the equipment from funds collected by the City from those buying the services furnished by such equipment. Such pay-

ments may be made over a term of years until a definite total is reached, being the selling price fixed by the seller. If the City fails to pay, the seller can recover for the balance due in an action similar to the one here.

For the foregoing reasons I dissent.